# IN THE COURT OF APPEALS OF IOWA

No. 21-0314
Filed May 26, 2021

IN THE INTEREST OF D.M.,
Minor Child,

K.M., Mother,
    Appellant,

MAGDALENA REESE, Guardian Ad Litem,
    Appellant.

_____

Appeal from the Iowa District Court for Warren County, Brendan Greiner, District Associate Judge.

A mother and her child's guardian ad litem separately appeal the juvenile court's permanency order. **REVERSED AND REMANDED.**

Karen A. Taylor of Taylor Law Offices, P.C., Des Moines, for appellant mother.

Magdalena Reese of Juvenile Public Defender, Des Moines, attorney and guardian ad litem for appellant minor child.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Frank Steinbach III of McEnroe, Gotsdiner, Brewer, Steinbach & Rothman, P.C., West Des Moines, for appellee father.

Considered by Doyle, P.J., and Mullins and May, JJ.

**MULLINS, Judge.**

A mother and her child's guardian ad litem (GAL) separately appeal the juvenile court's permanency order transferring sole custody of the child, born in 2013, to her father. Both the mother and GAL argue there was not clear and convincing evidence the child could not be returned to the mother's care at the time of the permanency hearing.[1]

I.      **Background**

This child-in-need-of-assistance (CINA) proceeding began in February 2019, following the Iowa Department of Human Services (DHS) completion of several child-protective assessments, the most recent involving a physical altercation between the parents, after which the mother was arrested. At the time, the parents were apparently divorced and shared physical care of the child. The parents had been placing the child in the middle of their conflicts for several years, the mother suffered from mental-health issues, and the child had poor school attendance and hygiene. The parents stipulated to a CINA adjudication, and the court placed the child in the temporary legal custody of the father under DHS

---

[1] The mother also argues the court erred in overruling her objections at the permanency hearing to allowing her two sisters to testify. The mother passively cites Iowa Code section 232.104 (2019) in support of her claim, but that statute is irrelevant on her evidentiary challenge. She fails to cite any other on point legal authority, so we deem the argument waived. *See* Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) ("A broad, all encompassing argument is insufficient to identify error in cases of de novo review."); *Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [a party] might have made and then search for legal authority and comb the record for facts to support such arguments."); *Inghram v. Dairyland Mut. Ins. Co.*, 215 N.W.2d 239, 240 (Iowa 1974) ("To reach the merits of this case would require us to assume a partisan role and undertake the appellant's research and advocacy. This role is one we refuse to assume.").

supervision with fully-supervised visitation for the mother. In its order for adjudication, the court detailed the mother's practice of corporal punishment, the child's resulting fear of the mother, the child's adverse physical reaction to being placed in the mother's care, the mother's inability to understand the child's medication, the mother's resistance to services, the mother's eviction being imminent, the poor condition of her home, the mother's criminal history, the child's poor hygiene and attendance at school, the mother's mental health, and the parents' inability to co-parent.

By the time of the dispositional hearing in September, the mother had obtained suitable housing, but concerns continued to loom about the mother's mental health and confrontational tendencies. The court directed the mother to "illustrate sincere and meaningful progress addressing her [mental health] before the court" would consider placing the child in her care. The court ordered temporary legal custody of the child remain with the father, subject to the mother's visitation.[2]

The matter proceeded to a review hearing in January 2020. In its review order, the court noted its continuing concerns for the mother's unresolved mental-health issues, discussing inappropriate matters in front of the child, placing the child in the middle of conflicts between the parents, the lack of water and heat in the mother's home, the mother's combativeness with service providers, and the trauma caused to the child by the mother's behaviors. The court directed the

---

[2] The mother appealed following disposition, challenging the custody determination and raising other issues. We affirmed. *See generally In re D.M.*, No. 19-1581, 2020 WL 4814135 (Iowa Ct. App. Aug. 19, 2020).

mother to demonstrate an ability to maintain a safe and stable home for the child and both parents to develop a system that would facilitate successful co-parenting. The court ordered the child remain in the father's temporary legal custody.

A permanency hearing was held in June, at which point the court granted the mother an additional six months. The court determined the need for removal would no longer exist if the mother demonstrated her ability to provide a safe and stable home as well as an ability to effectively co-parent with the father. Following a review hearing in October, the court scheduled a permanency hearing for January 2021. Before the permanency hearing, the mother filed a motion to modify disposition and placement, in which she alleged the father was undermining reunification efforts by discouraging the child's relationship with the mother. The mother also asserted she had engaged in recommended services and no safety concerns remained.

The permanency hearing was held over two days in January and February. By this point, the mother had completed co-parenting programming, but the father had not. At the hearing, DHS recommended the child remain in the father's custody for a short time but the mother continue visitation and continue working toward reunification. The mother sought return of the child to the parents' shared care arrangement under the dissolution decree. The GAL recommended a brief plan be put in place transitioning the child back to the parents' shared care. In her testimony, the child's therapist agreed with the GAL. She testified the child initially expressed fear of residing with the mother but, as time went on, that fear minimized. The therapist opined the mother has "built skills surrounding taking accountability for the things that she has done that ha[ve] maybe strained the

relationship with [the child]." The therapist could not identify any reason why the child should not be returned to the parents' shared care. The therapist added the father and his wife have been a barrier to the child's relationship with the mother. In contrast, the therapist testified the mother is more capable of fostering the child's relationship with the father. While the child has made statements that she does not feel safe in the mother's care, a clinical social worker testified the child's actions demonstrate the contrary. There were ongoing concerns that the father and his wife coached the child to make those statements. The worker added that the mother is committed to being able to co-parent with the father for the benefit of the child. The father made clear his concerns for the child being in the mother's care, but the worker testified the bases for the father's concerns are largely outdated.

The DHS worker testified the child initially indicated discomfort during visits with the mother, but those indications have since ceased. The worker also testified the professionals involved in the case were all of the opinion that the barriers causing the mother's instability were no longer present. The DHS worker described the transition plan to involve the child continuing overnight visits with the mother and increasing their frequency over the next four to six weeks until the child is back in the parents' shared physical care. The DHS worker testified the mother was ready to have the child in her care but easing the child back into the parents' shared care would be better for the child emotionally. By the time of the second day of the permanency hearing in February, the transition plan had been initiated, and the child was attending overnight visits with the mother twice per week, which would increase to three overnight visits the following week. Along with the other

professionals, neither the court-appointed special advocate nor the family centered services provider had any concerns about returning the child to the mother's care.

The child's special education teacher testified the mother "appeared angry" and "sounded angry" during the only time she met her in December 2020. The child's general education teacher detailed an "uncomfortable" interaction with the mother, also in December, during the child's virtual learning about the mother's concern for not having the necessary materials to facilitate the child's virtual learning when conducted from the mother's home. The general education teacher added the child reported to her that she does not like attending visits with her mother. The DHS worker testified she does not share the same concerns expressed by the educators.

In its permanency order, the court noted the child's and mother's progress in therapy, as well as the mother's progress on other fronts, such as progressing to unsupervised visitation, which went well and the child enjoyed and during which felt safe. Yet the court found returning the child to the parents' shared care "would have harmful effects on [the child's] mental and emotional health." The court highlighted the mother's supposedly volatile interactions with school officials and indicators from the child of trauma while at school. The court believed the mother was manipulating the professionals in her case to believe reunification was imminent based on the mother's progress. The court also determined the co-parenting issues were still ongoing and would continue into the future. As required by Iowa Code section 232.104(4), the court concluded termination was not in the child's best interests and sufficient services were offered but the child could still not be returned to the mother's care. The court concluded the child's best interests

mandated the permanency option of placing the child in the sole custody of the father pursuant to Iowa Code section 232.104(2)(d)(2).

The mother and GAL appeal.

## II.     Standard of Review

Appellate review of CINA proceedings is de novo.  *In re L.H.*, 904 N.W.2d 145, 149 (Iowa 2017).  While not binding upon us, we accord weight to the juvenile court's factual findings, especially when credibility is at issue.  *Id.*; *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002).   The child's best interests is our primary consideration.  *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014) (citation omitted).

## III.    Analysis

Following a permanency hearing, the court is required to exercise one of various options, including, among others, the following: (1) enter an order returning the child to the child's home, here meaning the parents' shared physical care; (2) continue placement of the child for an additional six months based on an enumeration of "the specific factors, conditions, or expected behavioral changes which comprise the basis for the determination that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period"; (3) direct the State to institute termination proceedings; or (4) transfer sole custody of the child from one parent to another.[3]   Iowa Code § 232.104(2)(a), (b), (c), (d)(2).

Here, the juvenile court chose the fourth option.  In order to exercise one of the options under section 232.104(2)(d),

---

[3] Paragraph (d) of section 232.104(2) provides for other options not relevant to this appeal.  *See* Iowa Code § 232.104(2)(d)(1), (3), (4).

convincing evidence must exist showing that all of the following apply:

(a) A termination of the parent-child relationship would not be in the best interest of the child.

(b) Services were offered to the child's family to correct the situation which led to the child's removal from the home.

(c) The child cannot be returned to the child's home.

*Id.* § 232.104(4).

Upon our de novo review of the record, we find the evidence less than convincing that the child could not be returned to the mother's home. By the time of the second day of the permanency hearing, the mother was exercising multiple overnight and unsupervised visits per week with no concerns. The court relied heavily on the testimony of the child's teachers in concluding the child would suffer harmful effects if returned to the mother's care on a shared care basis. But said testimony only concerned isolated incidents, and we, like the service providers, do not share the juvenile court's concerns. While the mother's sisters testified to her *history* of volatile and erratic behavior, they have not had a relationship with the mother for several years and have not been around to bear witness to the mother's progress. While some co-parenting issues remain, the mother has made considerable effort and progress on that front, and the lack of the same by the father and his wife should not serve as a demerit to the mother.

At the end of the day, we conclude the child could be safely returned to the mother's home during her parenting time under the shared care arrangement. Despite that finding, we are mindful of the service providers' position that a brief transition plan would serve the child's best interests. Absent from our record is the ongoings of the proceedings following the court's permanency order and if transition-aimed visitation has continued or discontinued. So, we reverse the

juvenile court's permanency determination, and we remand the matter to the district court to enter a permanency order exercising one of the options contained in Iowa Code section 232.104(2)(a), returning the child to the mother's care pursuant to the parents' shared care arrangement, or (b), allowing the mother additional time based on our determination that further transition planning would terminate the need for removal within six months.

**REVERSED AND REMANDED.**