# IN THE COURT OF APPEALS OF IOWA

No. 21-0561
Filed August 4, 2021

**IN THE INTEREST OF K.M.,**
**Minor Child,**

**STATE OF IOWA,**
        Appellant.
_____

Appeal from the Iowa District Court for Polk County, Romonda Belcher, District Associate Judge.

The State appeals the juvenile court's dismissal of a child-in-need-of-assistance petition. **AFFIRMED.**

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellant State.

Heidi Young of Gribble, Boles, Stewart & Witosky Law, Des Moines, for appellee mother.

Erin Mayfield of Youth Law Center, Des Moines, attorney and guardian ad litem for minor child.

Considered by Doyle, P.J. and Mullins and May, JJ.

**MAY, Judge.**

The State appeals the juvenile court's dismissal of a child-in-need-of-assistance (CINA) petition under Iowa Code section 232.2(6)(c)(2) and (d) (2021). We affirm.

The petition alleged K.M. needed assistance because her father allegedly sexually abused her. The father denied these allegations.

The juvenile court held a two-day hearing on the petition. The court heard testimony from K.M., who was eleven years old at the time; K.M.'s mother; K.M.'s father; and a child protective worker assigned to this case. The court also received exhibits, including a video recording of an hour-long forensic interview of K.M.

In a detailed ruling, the juvenile court presented its findings and conclusions. Based on the evidence presented, and "considering demeanor and mannerism, consistency and corroboration of the evidence," the court found "the father to be credible." The court was also concerned by certain aspects of K.M.'s reporting of the alleged abuse. Ultimately, the court concluded "the State has failed to show by clear and convincing evidence that" K.M. was a CINA as alleged. Accordingly, the court dismissed the petition. The State appeals.

"CINA proceedings are reviewed de novo." *In re H.W.*, 961 N.W.2d 138, 141 (Iowa Ct. App. 2021). We are not "bound by the juvenile court's factual findings, but give them weight, especially when credibility is at issue." *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002).

Our task is to determine whether the State carried its "burden of proving the allegations by clear and convincing evidence." Iowa Code § 232.96(2). "Clear and convincing evidence is evidence that leaves 'no serious or substantial doubt about

the correctness of the conclusion drawn from it.'" *D.D.*, 653 N.W.2d at 361 (citation omitted).

Following our de novo review, we conclude the State did not carry its "burden of proving the allegations by clear and convincing evidence." Iowa Code § 232.96(2). "This was a case of 'he said, she said'" in which witness "credibility was pivotal to the State's case." *Millam v. State*, 745 N.W.2d 719, 723 (Iowa 2008). And based on our review of the record, we find no reason to discount the findings of the juvenile court, which had "the ability to observe witnesses in person" and was therefore "best suited to make credibility findings." *In re A.Z.*, No. 18-1420, 2018 WL 4909831, at *2 (Iowa Ct. App. Oct. 10, 2018).[1] Instead, we adopt those findings as our own.

Because we agree with the juvenile court and believe there is little more we can add to the court's ruling, we affirm without further opinion. *See* Iowa Ct. R. 21.26(1)(d), (e).

**AFFIRMED.**

Doyle, P.J., concurs; Mullins, J., dissents.

---

[1] It is true we have been able to view a video recording of the child's interview. But we are still at a great disadvantage compared to the juvenile court, who was able to see and hear all of the witnesses' live testimony—including the father's and K.M.'s—*in addition to* watching the video recording. We note also that our review of the video recording has not undermined our confidence in the juvenile court's credibility determinations.

**MULLINS, Judge** (dissenting).

I respectfully dissent.

The State argues the evidence was sufficient for adjudication pursuant to Iowa Code section 232.2(6)(c)(2) and (d) (2021).  The child's mother argues the juvenile court correctly declined to adjudicate the child.  The father did not file a response to the petition on appeal.

The child was brought to the United States from Honduras by the father. The child's mother has attempted to enter the United States twice but has not been successful.  The child and father initially lived in Illinois but relocated to Iowa in 2020.  The child reported to a non-familial caregiver in Iowa that the father sexually abused the child.[2]  The child said the father forced intercourse on the child "like an adult."  The child alleged the conduct took place in Illinois and Iowa when the child was ten and eleven years old.   When the father was confronted about the allegations, he fled to Illinois.  He eventually returned to Iowa to be involved with the investigation.

The child was eleven years old at the time of the report and investigation. The child is a native Spanish speaker and required the assistance of an interpreter during the investigation and adjudication hearing.  When the child was interviewed for the investigation, the child consistently reported, through the male interpreter who was not known to the child, that the father forced the child to engage in sexual intercourse "like an adult."[3]  The child was asked several times to identify which

---

[2] The child referred to the caregiver as "grandma," but they are not actually related.
[3] This court reviewed the video of the child's interview but did not receive a transcript of it.

body parts were touched. The child described body parts as "parts," "my parts," or "his parts" during the interview. When asked about how the bodies moved, the child responded "I don't know" and later said that adults engaging in the same conduct do "what they have to do." When the child testified at the adjudication hearing, the child was able to identify body parts and describe the conduct. At the hearing, the child reported "he put his penis in my vagina."

When the father fled to Illinois, he was attempting to avoid the risk of incarceration and the implications the investigation might have on his immigration status. When he returned to Iowa, the father cooperated with police and the Iowa Department of Human Services (DHS) for their investigations. The father reported that he brought the child from Illinois to Iowa following a report that the child was being abused. When asked about what the abuse in Illinois was, the father reported that men wanted to hug the child and had allegedly asked for a kiss and her phone number. The father also alleged that the child had made abuse allegations when the family was living in Honduras.

The father insisted the child fabricated the allegations. He alleged the child is angry because of the father's strict rules regarding clothing, hair color, and church attendance. The father also alleged the child is angry because the father will not let her have a boyfriend. The father stated the child does not want to live with him anymore and created the allegations to escape from his care. The child also testified that the father was strict and the child did not want to live with him. The child reported that the mother, who initially denied the abuse allegations, now believed the child and hoped the mother could come to Iowa to provide a home for the child.

The juvenile court found the father's testimony more credible than the child's. The juvenile court was also troubled by the child's vague descriptions of body parts and sex acts during the interview and changes to the child's language during the hearing. It found the State failed to prove the child should be adjudicated a child in need of assistance by the required clear and convincing evidence and dismissed the petition. The State appeals.

Adjudication pursuant to section 232.2(6)(c)(2) requires clear and convincing evidence that the child is an unmarried child "[w]ho has suffered or is imminently likely to suffer harmful effects as a result of. . . [t]he failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child." "Harmful effects" are present when a child suffers harm to their "physical, mental, or social well-being." *In re J.S.*, 846 N.W.2d 36, 42 (Iowa 2014). When considering whether harmful effects are "imminently likely," our supreme court uses a liberal interpretation of the phrase. *Id.* at 43. "Child protection statutes are designed to prevent probable harm to the child and do not require delay until after harm has occurred." *In re L.H.*, 904 N.W.2d 145, 150 (Iowa 2017) (altered for readability).

Adjudication pursuant to section 232.2(6)(d) requires clear and convincing evidence that the child is an unmarried child "[w]ho has been, or is imminently likely to be, sexually abused by the child's parent, guardian, custodian, or other member of the household in which the child resides." Adjudication pursuant to section 232.2(6)(d) focuses on harm due to sexual abuse, rather than the range of harms described in 232.2(6)(c)(2). However, the same interpretation of "imminently likely" applies to section 232.2(6)(d). *J.S.*, 846 N.W.2d at 43.

The record in this case shows that the father brought the child to this country, secured housing for the family, and education for the child. The father also sought family members or hired non-family members to care for the child when he was at work. The child had access to communication with the mother, who sometimes helped the child with schoolwork. The only harm in this case stems from the child's allegations of sexual abuse at the hands of the father. Over time, the mother said she believed the child's allegations.[4] However, the juvenile court found the father was a more credible witness than the child. *See In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002). Furthermore, following an investigation, the Des Moines police declined to bring criminal charges against the father and the case was "exceptionally cleared and closed."

The juvenile court also noted that "the father is willing to engage in any necessary therapy with the child without the need for court intervention." However, without juvenile court intervention, there is no guarantee that any therapy would actually occur. Furthermore, the family would not have access to the help that the court and DHS can provide to obtain those services. I understand the juvenile court's attention to the changes in the child's language over time. But, there is an obvious language-barrier issue here and perhaps cultural issues at play. We do not know what the child's education was like in Honduras or whether the child had

---

[4] The child initially reported the mother did not believe the allegations. However, at the adjudication hearing, the mother testified that she believed the child and would make sure the child was safe from the father. But the mother's counsel argued the juvenile court should dismiss the petition because the State had not proved the grounds for adjudication. The record contains no explanation of why the mother's belief in the veracity of the allegation changed or why she resisted adjudication when her testimony was that she believed the child.

been taught to use the word "parts" to describe sex organs. Although the child's language did change between the interview and adjudication hearing, the substance of what the child reported was consistent. The child said repeatedly that the father engaged the child in sexual intercourse "like an adult." And when initially confronted with the allegations against him, the father fled the state.

This is a close case. We give weight to the juvenile court's credibility determination favoring the father. *Id.* Even so, based on my de novo review of the record, including the one-hour video recording of the interview, during which I listened to and observed the demeanor—in particular, her body language during questions concerning more graphic content—of the child during that interview, I disagree with the juvenile court's discounting of the child's descriptions of the alleged abusive events. The interview shows a young girl obviously cautious in some of her explanations. She knew she was being watched by cameras; the interview was being recorded, and she was being observed live by persons not in the room; and her language interpreter was a male. Use of vague terms, rather than precise, graphic identification of body parts and functions, is not surprising and was no doubt less uncomfortable for her first somewhat formal recitation of events. The fact that she was more descriptive when later testifying in court could be easily explained by the likelihood of the child having progressed to greater ease at describing the events to persons in official capacities, and perhaps even preparation by counsel advising her to be candid in her descriptions of events. The juvenile court also placed great weight on the claims the child did not like the father's rules and did not want to live with him at this time. If, however, her allegations are true, those claims would not be unexpected and would not be

circular reasons for discounting the allegations. On the flipside, the court's credibility findings in favor of the father rest largely on its rejection of the child's allegations and simply believing that father's denials, notwithstanding he has obvious reasons to deny the events if they happened as alleged. In short, I would find the child's testimony clear, precise, and direct, and the father's denials insufficient to defeat the allegations.

While I recognize the father's difficult burden in trying to disprove the allegations in a "she said, he said" case, our constant guide is the best interests of the child. *J.S.*, 846 N.W.2d at 40–41. Because I find the child's testimony credible, it is not in the best interests of the child to return the child to the care of the father, the alleged abuser. I would find the State proved the grounds for adjudication pursuant to section 232.2(6)(c)(2) and (d) by clear and convincing evidence. Accordingly, I respectfully dissent and would reverse and remand this case for further proceedings.