# IN THE COURT OF APPEALS OF IOWA

No. 23-1916
Filed April 24, 2024

**IN THE INTEREST OF A.V., A.V.-N., A.V., and S.C.,**
**Minor Children,**

**M.V.-C., Mother,**
        Appellant,

**J.C., Father of S.C.,**
        Appellant.

_____

Appeal from the Iowa District Court for Shelby County, Charles D. Fagan,

Judge.

A mother and a father separately appeal the termination of their parental

rights. **AFFIRMED ON BOTH APPEALS.**

Sara E. Benson of Meldrum & Benson Law, P.C., Council Bluffs, for

appellant mother.

J. Joseph Narmi, Council Bluffs, for appellant father of S.C.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney

General, for appellee State.

William Early, Harlan, attorney and guardian ad litem for minor children.

Considered by Bower, C.J., and Greer and Chicchelly, JJ.

**GREER, Judge.**

This appeal concerns four minor children—Ad.V., born May 2015; S.C., born June 2017; A.V.-N., born July 2019; and Ar.V., born February 2021. The mother (M.V.-C.) of all four children and S.C.'s father (J.C.) separately appeal the termination of their parental rights. At the time of the termination proceedings, Ad.V. resided with her biological father, A.S., and the fathers of A.V-N. and Ar.V. were unknown.[1] Upon our review, we affirm the termination as to both parents— M.V.-C. and J.C.

**I. Background Facts and Prior Proceedings.**

This family first came to the attention of the Iowa Department of Health and Human Services (the department) in June 2021 after the department received allegations that J.C. was sexually abusing Ad.V. As part of the investigation of the allegations, Ad.V. and S.C. participated in forensic interviews. During her interview, Ad.V. described J.C. touching and licking her "vagina" as well as putting his penis in her "pee hole" and mouth. She said that "excited stuff comes out of his penis" and that the "excited stuff" would get on her belly. She reported that she could not push him off her because "he's too big and too strong." S.C. shared that J.C. touched his "wee-wee" and spanked him with a belt and a stick. The allegations led to a founded sexual abuse investigation by the department. The State filed child-in-need-of-assistance (CINA) petitions for all four children.

---

[1] Although efforts were made to DNA test other potential fathers, at the time of the termination trial, the parental rights of the two unknown fathers of A.V.-N. and Ar.V. were also terminated.

All four children were removed from the mother's home in July via ex parte removal order and placed in the custody of the department; they have been out of parental custody continuously since that time. The juvenile court confirmed the removal later that month and ordered visitation at the discretion of the department but ordered that J.C. was to "have no contact with the children at this time due to [the] pending sexual abuse investigation." The children were all adjudicated CINA pursuant to Iowa Code section 232.2(6)(c)(2) and (d) (2021) in August. The mother reported that she was seeking a divorce from J.C.; yet, law enforcement and the mother's therapist observed them together in the community and the mother's vehicle parked at J.C.'s home.

Ad.V. exhibited behavioral issues including sleepwalking, nightmares, hoarding food, and eating out of the trashcan. S.C. also struggled with behavioral issues[2] including sleepwalking, nightmares, hoarding food, eating out of the trashcan, bedwetting, and soiling himself. On one occasion his foster father found him with no pants on, and S.C. stated that that was how he played at the mother's home. At visits with the mother, department social work case managers reported concerns with finding bedbugs in Ar.V.'s diaper and a family centered services worker reported that the mother used a dirty highchair and bottle with the children. Because of the bedbug infestation, one of the foster families demanded video rather than in-person visits so that the children would not potentially bring bedbugs into the foster family's home. Visits were moved to a public location where the

---

[2] S.C. was diagnosed with depression, autism, disruptive mood dysregulation disorder, attention deficit hyperactivity disorder, oppositional defiant disorder, and panic disorder.

mother had one fully supervised two-hour visit with all four children a week, although the mother frequently cancelled visits. Ad.V. told her foster mother and a social work case manager that she did not want to see the mother and was not comfortable being around her. S.C. would claim that he had a stomachache and could not go to visits; he made these statements to his foster parents and teachers.

In January 2022, paternity testing confirmed J.C. as S.C.'s biological father. In May, the mother had a full bedbug extermination performed on the home and visits moved back to the mother's home. However, at a visit in July, the social work case manager noticed the home smelled of cat urine and learned that the mother had at least four adult cats, four kittens, and a puppy; one of the adult cats was pregnant. There was also animal waste on the floor and, because the litter box did not have enough cat litter, pee on the floor as well.

In August, the no-contact order between J.C. and S.C. was lifted. Visits between J.C. and S.C. began in October, and S.C. would hit, kick, and bite himself afterwards. J.C. had two fully supervised two-hour visits with S.C. per month, and the mother's visits with S.C. were decreased to the same frequency. Department caseworkers reported that J.C. did not seem to know what to do with a child of S.C.'s age, and S.C. did not want to go to visits. The mother had a fifth child, T.C., in November. This child was not removed from the mother's custody.[3] At a visit between the children and the mother in January 2023, the family centered services worker noted that the mother was unable to supervise all five children

---

[3] T.C. is also not part of our case.

simultaneously and relied on the worker for help. The mother was employed on and off during this time.

A petition to terminate both parents' rights was filed in May. It cited issues with safety and lack of adequate supervision in the mother's home along with the mother's difficulty in maintaining stable employment in its petition to terminate the mother's parental rights. In its petition to terminate J.C.'s parental rights, it pointed to the lack of significant improvements in his parenting skills and S.C.'s behavior the days following visits with his father. At that time, Ad.V. had been placed in the care of her biological father since June 2022; A.V.-N. and Ar.V. were placed together in foster care, and S.C. was placed with a separate foster care family. The department continued to offer family safety, risk, and permanency services; foster care placement; supervised visitations; mental-health services/treatment; transitional services; family team meetings; and both individual and family counseling/therapy services.

The court held a termination hearing over two days in July and September. At the hearing, the social work case manager testified that there was very little evidence of bonding between J.C. and S.C. The case manager also clarified that the department had concerns about the safety of all of the children while they were all in the mother's care together; the department had not opened a case for T.C. because T.C. was the only child currently in the mother's care, and the mother did not have issues with one child at a time. In addition, the case manager acknowledged that J.C. has two older children, one who was believed to be seventeen years old and one that was an adult. The family centered services worker testified that she did not believe that any extra visits between J.C. and S.C.

would allow for J.C. to progress in parenting skills because the department had "been doing this since February and there hasn't been any progression." She added that the mother cancelled about one visit per month. The mother testified that she was pregnant again and due in April 2024. She also stated that she caught S.C. "in the room with Ad.V., and I had to separate them and scold them both and tell them why what [S.C.] was doing to [Ad.V.] was not appropriate."

The mother and J.C. both moved to dismiss the petition to terminate their parental rights or to continue it for six additional months. They argued that because they both have other children in their care—the mother has T.C. and J.C. has his seventeen-year-old—that there must not be concerns with their parenting. The court denied the motions and terminated the mother's rights to all four children under Iowa Code section 232.116(1)(e) (2023); to Ad.V., S.C., and A.V.-N. under paragraph (f); and to Ar.V. under paragraph (h). It terminated J.C.'s rights to S.C. under section 232.116(1)(e) and (f). The court stated that it "does not feel that causing continued trauma is warranted given the parents' inability to form bonds with their children and the ongoing harm shown." Furthermore, the court found that "[r]easonable, but unsuccessful, efforts were made to reunify the children with their parents." The mother and J.C. separately appeal.

## II. Standard of Review.

We review the termination of parental rights de novo. *In re Z.K.*, 973 N.W.2d 27, 32 (Iowa 2022). We give careful consideration to the court's factual findings and determinations based on in-person observations, but we are not bound by them. *In re W.M.*, 957 N.W.2d 305, 312 (Iowa 2021). "[O]ur fundamental concern"

in review of termination proceedings "is the child[ren]'s best interests." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014).

## III. Analysis.

In general, we follow a three-step analysis in reviewing the termination of a parent's rights. *In re P.L.*, 778 N.W.2d 33, 39 (Iowa 2010). We first consider whether there is a statutory ground for termination of the parent's rights under section 232.116(1). *Id.* Second, we look to whether termination of the parent's rights is in the child's best interests. *Id.* (citing Iowa Code § 232.116(2)). Third, we consider whether any of the exceptions to termination in section 232.116(3) should be applied. *Id.* We review only those steps that are actually raised and briefed on appeal by the parent challenging termination. *See Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996). We address each parent's appeal separately.

## A. Mother's Appeal.

The mother challenges the juvenile court's ruling as to the statutory grounds for removal, reasonable efforts on the part of the department, and the best interests of the children.

*1. Statutory Grounds.* First, the mother argues that the State did not meet its burden to prove the statutory grounds for termination. "There must be clear and convincing evidence of the grounds for termination of parental rights." *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). But "we may affirm the . . . order on any ground that we find supported by clear and convincing evidence." *In re D.W.*, 791 N.W.2d

703, 707 (Iowa 2010). Here, we choose to focus on paragraphs (f)[4] and (h),[5] which both require clear and convincing evidence that the children could not be returned to the mother's custody at the time of the termination hearing. *See* Iowa Code §§ 232.116(1)(f)(4), (h)(4); *M.W.*, 876 N.W.2d at 223 (interpreting "at the present time" to mean "at the time of the termination hearing").

The mother's arguments regarding the statutory grounds all relate to her own testimony about her home and ability to provide and care for her children. But the State presented testimony to the contrary, including testimony by multiple department staff members describing the state of the mother's home as unclean and unsafe for the children. Bedbugs in the home are a health concern. *See In re Z.I.*, No. 20-1473, 2021 WL 811130, at *2 (Iowa Ct. App. Mar. 3, 2021); *In re*

---

[4] The court may order the termination of parental rights under paragraph (f) if it finds that all of the following have occurred:
> (1) The child is four years of age or older.
> (2) The child has been adjudicated [CINA].
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents . . . at the present time.

Iowa Code § 232.116(1)(f). The mother only challenges the fourth element.

[5] The court may order the termination of parental rights under paragraph (h) if it finds that all of the following have occurred:
> (1) The child is three years of age or younger.
> (2) The child has been adjudicated [CINA].
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents . . . at the present time.

Iowa Code § 232.116(1)(h). The mother again only challenges the fourth element.

*T.P.*, No. 18-1159, 2018 WL 4381550, at *1 (Iowa Ct. App. Sept. 12, 2018) (describing the bedbug infestation as an issue with the cleanliness of the home).

On top of cleanliness issues, the children shared concerns about "bad people" the mother associated with who scared them or caused them to feel unsafe. It appeared the mother lacked insight about decisions she was making that directly impacted the children's safety. To this end, the department noted the mother's history of associating with people who had criminal records that included being on the sexual abuse registry and who were involved with substance use and abuse allegations. The mother also did not fully acknowledge the sexual abuse by J.C. against Ad.V. and continued to have interactions with J.C. "[R]efusal or inability to address the danger of sexual abuse" amounts to a safety risk to the children. *In re A.S.*, No. 22-0260, 2022 WL 1100304, at *3 (Iowa Ct. App. Apr. 13, 2022); *accord In re D.D.*, 955 N.W.2d 186, 192–93 (Iowa 2021). During the pendency of the case, it became clear that the mother talked to the children about topics that were not age-appropriate, told the children to lie, and struggled with basic parenting skills during her two-hour visits. The department had concerns over the mother's mental health, but the mother was not always forthcoming about her treatment and was often hostile and volatile in her interactions with the department. The mother's therapist noted serious concerns about the mother's decision-making ability and lack of insight over how to keep her children safe from future harm.

Furthermore, the mother never progressed beyond supervised visits with the children. *See In re C.N.*, No. 19-1861, 2020 WL 567283, at *1 (Iowa Ct. App. Feb. 5, 2020) ("[The mother] never progressed to unsupervised visits or trial home

visits. Without this necessary progression, we cannot say the children could have returned to the mother's care."). "We look to the past for indicators of what is likely to occur in the future." *In re M.P.*, No. 19-0995, 2019 WL 5063337, at \*5 (Iowa Ct. App. Oct. 9, 2019); *see also In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) ("When making this decision, we look to the parents' past performance because it may indicate the quality of care the parent is capable of providing in the future." (citation omitted)). Thus, without any demonstrated progress through improvement in cleanliness or semi-supervised visits in the mother's home, we find that the State presented clear and convincing evidence that the children could not be returned to her custody at the time of the termination hearing.

*2. Reasonable Efforts.* The mother asserts that the one, two-hour visit per week did not constitute reasonable efforts to reunify her with the children. But to preserve a challenge to reasonable efforts, our case law generally requires that a parent complain to the juvenile court directly "to demand other, different or additional services." *In re S.R.*, 600 N.W.2d 63, 65 (Iowa Ct. App. 1999). Furthermore, a parent cannot challenge reasonable efforts for the first time on appeal or even first raise a challenge at the termination hearing. *See In re E.H.*, No. 21-0467, 2021 WL 2709486, at \*2 (Iowa Ct. App. June 30, 2021). A parent must alert the juvenile court of any perceived deficiency in services "at the removal, when the case permanency plan is entered, or at later review hearings." *In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002). When a parent fails to timely request additional or different services, the parent waives any reasonable-efforts challenge. *Id.* Here, the mother never timely informed the court of any deficiency in services, so her reasonable-efforts challenge is waived.

*3. Best Interests.* First, we note that the strength of the parent-child bond is not one of the considerations in the best interests analysis. *See In re A.B.*, No. 23-0235, 2023 WL 3335422, at *2 (Iowa Ct. App. May 10, 2023) ("In considering the best interests of the children, we are required to use the best-interests framework set out by our legislature. And that framework does not include the word 'bond.'" (internal citations omitted)); *In re E.S.*, No. 23-0590, 2023 WL 4104126, at *2 (Iowa Ct. App. June 21, 2023) ("Consideration of the parent-child bond is not a part of our best-interests analysis.").

Removing the reference to the strength of the bond between the mother and the children, the mother makes only the following argument on best interests: "There was insufficient evidence presented that it is in the children's best interest to permanently sever the child-parent relationship. It would be detrimental to the well-being of the children should parental rights be terminated." Without developing how the facts in this record support her position or citing legal authority, we find that this argument is waived. *See* Iowa Rs. App. P. 6.201(1)(d) ("The petition on appeal must substantially comply with rule 6.1401—Form 5."), 6.1401—Form 5 ("[S]tate what findings of fact or conclusions of law the district court made with which you disagree and why, generally referencing a particular part of the record, witnesses' testimony, or exhibits that support your position on appeal . . . . General conclusions . . . are not acceptable. Include supporting legal authority for each issue raised, including authority contrary to appellant's case, if known."); *see also In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000) ("A broad, all encompassing argument is insufficient to identify error in cases of de novo review.").

**B. J.C.'s Appeal.**

J.C. argues that the statutory grounds for termination were not met, termination of his rights is not in S.C.'s best interests, the department failed to make reasonable efforts to reunify him and S.C., and the strength of their bond precludes termination.

*1. Statutory Grounds.*  Here, again, we choose to focus on termination under paragraph (f).  *See D.W.*, 791 N.W.2d at 707 (allowing court to affirm termination on any ground supported by the record).  J.C. only challenges the fourth element of this paragraph: that there was clear and convincing evidence that S.C. could not be returned to his custody.  J.C. contends that he has been a good and appropriate father to S.C. in spite of S.C.'s severe behavioral issues and the allegations of sexual abuse against him.  Yet, at the same time that J.C. argues that S.C. is only with him for a few hours a month and thus S.C.'s behaviors cannot be blamed on him, he also contends that more time with him would remedy S.C.'s behavioral issues and resolve the claims against him.  We disagree.  J.C. never progressed beyond fully supervised visits and failed to demonstrate that returning S.C. to his care would not cause S.C. further harm.  *See C.N.*, 2020 WL 567283, at *1; *J.E.*, 723 N.W.2d at 798.  And J.C. does not address the sexual abuse allegations made by Ad.V. or S.C.  *See In re L.H.*, 904 N.W.2d 145, 150 (Iowa 2017) (noting "the common sense notion that, ordinarily, all siblings are at risk when one child has been sexually abused" (citation omitted)).  Here, again, we recognize that "refusal or inability to address the danger of sexual abuse" amounts to a safety risk to the child.  *A.S.*, 2022 WL 1100304, at *3; *accord In re M.L.*, No. 11-1326, 2011 WL 5389620, at *4 (Iowa Ct. App. Nov. 9, 2011) ("The fact remains that the parents

have 'no insight in what happened so that it's not going to happen again.' Without that insight, the services provided to, and received by, the parents cannot ensure that an abused child . . . would be safe."). Thus, because of the safety risk to S.C., we find that the State has met its burden and the statutory ground for termination was met.

2. *Best Interests.* Here, J.C. asserts that S.C. should be with his two half siblings and, thus, termination is not in S.C.'s best interests. Yet, we note that one of the half-siblings is already an adult and living out of state and the other is seventeen years old. The existence of the one half-sibling in the home does not change our analysis. While there is "a preference to keep siblings together," the "preference is not absolute" and must give way to the children's best interests. *J.E.*, 723 N.W.2d at 800. In considering the best interests of the child we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). As our case law provides, the defining elements in the child's best interests are the child's safety and need for a permanent home. *J.E.*, 723 N.W.2d at 801 (Cady, J., concurring specially). Both S.C.'s safety and need for a permanent home point towards termination, for the same reasons discussed above. Because multiple department workers noted that J.C. was unsure what to do with a child of S.C.'s age and J.C. failed to address the sexual-abuse allegations against him by S.C. or Ad.V, S.C.'s best interests require termination.

3. *Reasonable Efforts.* Next, J.C. repeatedly argues that four hours of visitation a month did not constitute a reasonable effort to reunify him with S.C. He

claims that he made requests for reasonable efforts at the May 2022 and January and April 2023 hearings. But in the May 2022 order, the court found reasonable efforts had been made and noted that J.C. was under a no-contact order as to S.C. and would not have therapeutic visitation until it was deemed appropriate by S.C.'s therapist. Likewise, the January[6] and April 2023 orders confirm reasonable efforts being made without any notations of a request for more time or other services by J.C. Even so, he did not request transcripts of those hearings or cite to any places in our available record for support of his claimed reasonable-efforts requests. Thus, we are unable to verify if J.C. did, in fact, make timely challenges.

However, assuming without deciding that he did, "the nature and extent of visitation is always controlled by the best interests of the child." *In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996); *see also* Iowa Code § 232.102A(1)(a) ("A child's health and safety shall be the paramount concern in making reasonable efforts."). Applying the best-interest-of-the-child standard to visitation frequency and duration "may warrant limited parental visitation." *M.B.*, 553 N.W.2d at 345; *accord id.* (finding no failure to make reasonable efforts when the department did not increase visitation because the mother had "demonstrated an inability to make those changes in her life essential to proper parenting, including her continued codependency on abusive males"). Here, given the ongoing sexual abuse allegations against J.C. by Ad.V. and S.C., which included a no-contact order that was not lifted until August 2022, we find that the visitation afforded J.C. was reasonable and the department did not fail to make reasonable efforts.

---

[6] As of January, J.C. still had not completed the mental-health evaluation with a parenting assessment requested by the department.

*4. Permissive Exception.* As a final argument, regarding the permissive exception J.C. writes that "[c]learly there is a very-very-very strong bond" between him and S.C. and "[d]ue to the closeness of the parent-child relationship, terminating [his] parental rights would be absolutely devastating" to S.C. "The court need not terminate the relationship between the parent and child if the court finds . . . [t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). However, "the existence of a bond is not enough. The law requires clear and convincing evidence that 'termination would be detrimental to the child . . . .'" *In re A.B.*, 956 N.W.2d 162, 169 (Iowa 2021) (quoting Iowa Code § 232.116(3)(c)). And the burden is on J.C. to prove such a detriment to S.C. *See In re A.S.*, 906 N.W.2d 467, 476 (Iowa 2018) (providing the parent has the burden to establish a permissive exception to termination should be applied).

Here, not only has J.C. not met that burden, but evidence in the record establishes the contrary. S.C. often did not want to attend visits with J.C., telling his foster family and his teachers that he did not want to go and that his stomach hurt. When S.C. did attend, he exhibited increased behavioral issues afterwards including hitting, kicking, and biting himself. Such a reaction does not evidence the type of strong bond that J.C. claims and does not overcome the advantage to S.C. of termination. Thus, we decline to rely on the permissive exception in this instance.

**IV. Conclusion.**

Because we conclude after our de novo review of the record that a statutory ground for termination was met as to each child and the mother has waived her challenges to reasonable efforts and the best interests of the children, we affirm the termination of her parental rights. We also affirm the termination of J.C.'s parental rights to S.C., holding that a statutory ground for termination was proved by clear and convincing evidence, termination is in S.C.'s best interests, the department made reasonable efforts at reunification, and the strength of J.C.'s bond with S.C. does not overcome the advantage of termination.

**AFFIRMED ON BOTH APPEALS.**