**IN THE COURT OF APPEALS OF IOWA**
No. 25-0187
Filed April 23, 2025

**IN THE INTEREST OF L.W. and J.W.,**
**Minor Children,**

**D.W., Mother,**
　　　Appellant.
_____

　　　Appeal from the Iowa District Court for Mahaska County, Patrick McAvan, Judge.

　　　A mother appeals the juvenile court order adjudicating her two minor daughters as children in need of assistance and the subsequent dispositional order.　**AFFIRMED.**

　　　Denise M. Gonyea of McKelvie Law Office, Grinnell, for appellant mother.

　　　Brenna Bird, Attorney General, and Mackenize Moran, Assistant Attorney General, for appellee State.

　　　Rebecca L. Petig, Grinnell, attorney and guardian ad litem for minor children.

　　　Considered without oral argument by Tabor, C.J., and Schumacher and Sandy, JJ.

**SANDY, Judge.**

A mother appeals the juvenile court order adjudicating her two minor daughters as children in need of assistance (CINA) and the subsequent dispositional order.[1]

Upon our de novo review of the record, we affirm.

## I.      Background Facts and Proceedings

J.W. and L.W. are the children at issue in this appeal.  J.W. was born in 2007, and L.W. was born in 2011.  The mother has a history with substance use which has repeatedly brought the family to the attention of the Iowa Department of Health and Human Services (HHS).  In 2017, a founded child abuse assessment was issued against the mother after she was arrested for operating while intoxicated.  The children were present in the vehicle while the mother was driving.  As the mother was being arrested, police officers also discovered marijuana and methamphetamine hidden in her clothing.

In 2020, the mother was the subject of two unfounded child abuse assessments based on allegations she was using methamphetamine while caring for the children.  One of the reports was unfounded because HHS could not locate the mother, and the other was unfounded due to the mother's refusal to provide a drug test.

The family again came to the attention of HHS on March 8, 2024, after HHS received reports the mother and father were using methamphetamine and sexually

---

[1] *See In re Long*, 313 N.W.2d 473, 477 (Iowa 1981) (finding that a pre-dispositional order for adjudication is not a final order appealable as a matter of right).

abusing the children.[2]  After  receiving the allegations, Nikki Pansegrau—a child protective worker with HHS—was tasked with investigating the allegations. Pansegrau began her investigation by attempting to contact the mother at her purported address in Montezuma.  However, after arriving at the house, Pansegrau discovered no one was home.

Pansegrau then walked around the exterior of the house for several minutes.  While walking around the house, Pansegrau observed "blankets up on windows."  Additionally, she noticed "two cameras in the back facing the [back] door; one out of a side window and one out of an upper window of the house that pointed towards the door."  Pansegrau testified at the adjudication hearing that, while this wasn't necessarily indicative of substance use, it a raised a "red flag" for HHS.  Pansegrau also spoke with a neighbor who told her "that nobody had been for a few days, but there were lots—there was lots of traffic in and out that he noticed."  Pansegrau testified this was another "red flag" for her and HHS.

After failing to make contact with the mother, Pansegrau decided to speak with the children at their school in Montezuma on March 12.  Pansegrau first spoke

---

[2] At all times during the pendency of this case, the father has been incarcerated at the Mahaska County Jail on "several drug charges."  At the dispositional hearing, the father's attorney informed the juvenile court that the father "pled guilty in FECR065132 to a drug charge that's going to result in twenty-five-year prison sentence."  The mother and father were married at one time, but their marriage was dissolved in April 2018.  As part of a stipulated agreement, which the district court incorporated as a part of its dissolution decree, the mother and father agreed to joint legal custody of the children.  The agreement also provided that the father would have primary physical care of the children.  However, after the father was evicted from his residence a few years ago, the mother and father informally agreed that the mother would have primary physical care of the children.  The children have been under the mother's exclusive care since this informal agreement.

with L.W. Pansegrau testified that both children were "very guarded" during her conversations with them. L.W. denied that her mother had sexually abused her and was actively using substances. However, L.W. told Pansegrau that the mother would "stay up all night and sleep in." This was yet another "red flag" for Pansegrau.

Pansegrau subsequently spoke with J.W. She also denied allegations of sexual abuse and the mother's substance use. According to Pansegrau, J.W. "denied everything and didn't have any concerns with Mom." She also informed Pansegrau about the family's living situation. J.W. told Pansegrau she and L.W. were living with the mother in Montezuma. However, J.W. said they were in the process of moving into a home in Barnes City with the mother's current boyfriend.

After speaking with the children at their school, Pansegrau continued with her attempts to locate and speak with the mother. According to her:

> I just continued on to look for [the mother]. I went back to the house. I had some addresses in Barnes City that I knew of. So I just attempted to locate [the mother] over the next couple of days. The second time I went to the house, I took Detective Kivi with me from the Poweshiek County Sheriff's Office. And again nobody was home, but the security cameras had been taken down at that point.

Following two weeks of unsuccessful attempts to contact the mother, Pansegrau decided to attempt to speak with the mother after she dropped the children off for school. To help her contact the mother at the children's school, Pansegrau requested assistance from Poweshiek County Sheriff's Deputy Matt Maschmann. On the morning of March 26, after the mother dropped the children off in front of the school, Deputy Maschmann pulled up alongside the mother's vehicle and asked if she would be willing to speak with him. The mother replied that she would.

She then followed Deputy Maschmann to a nearby parking lot. Shortly after the mother and Deputy Maschmann parked their vehicles, Pansegrau pulled up and parked beside them. The mother stayed in her vehicle.

Pansegrau and the mother had a conversation for several minutes in the parking lot. The mother admitted to Pansegrau that she was aware HHS had made numerous attempts to speak with her. However, the mother stated she did not believe she needed to speak with anyone because Pansegrau had already spoken with the children. After Pansegrau informed her of the allegations HHS had received, the mother became "very defensive."

Deputy Maschmann described the mother's behavior as "erratic" during her conversation with Pansegrau. He testified at the adjudication hearing that the mother "wasn't able to hold a conversation" and "couldn't sit still." Pansegrau observed similar behavior. According to her, the mother "moved around a lot in her car," "jumped topics often," and was "irrational with her thinking." Pansegrau—who is a former substance-use counselor and has received training for recognizing behavioral indicators of substance use—testified that the mother's behavior during their conversation was consistent with typical behavioral indicators of substance use. Additionally, Pansegrau observed two sores on the mother's face.

When asked by Pansegrau if she would be willing to drug test for HHS, the mother replied, "[l]et's do it right now." The mother was under the impression that Pansegrau and HHS wanted a urine analysis. However, when Pansegrau informed the mother the drug test would be a hair stat test, she stated she would not cooperate. The mother then turned to Deputy Maschmann and told him she wanted to report Pansegrau for using methamphetamine.

Pansegrau completed her investigation into the allegations and issued a founded child abuse assessment for use of dangerous substances on April 5.[3] The State subsequently filed a child-in-need-of-assistance petition for J.W. and L.W. Pansegrau also submitted a list of recommendations to the juvenile court, which recommended the mother submit random drug screens at the request of HHS, obtain a substance-use evaluation, and obtain a mental-health evaluation.

In June, prior to the adjudication hearing, the mother performed a hair stat test. The results came back positive for methamphetamine. The mother also obtained a substance-use evaluation in August, which recommended no treatment. The substance-use evaluation disclosed the mother first began using methamphetamine when she was nineteen. During the evaluation, the mother denied using methamphetamine in the past twelve months. Additionally, she self-reported that she last used methamphetamine over a decade ago. However, during her testimony at the adjudication hearing, the mother admitted she failed to disclose her recent positive test for methamphetamine to her substance-use evaluator.

The juvenile court held an adjudication hearing in September 2024. The mother, Pansegrau, and Deputy Maschmann testified at the hearing. Following the hearing, the juvenile court adjudicated the children in need of assistance pursuant to Iowa Code section 232.96A(3)(b) (2024).[4] As part of the adjudication

---

[3] The assessment noted the allegations of sexual abuse were unconfirmed.

[4] The CINA petition filed by the State also asserted the children were in need of assistance pursuant to paragraphs (a) and (c) of the same subsection. However, the juvenile court concluded the evidence was insufficient to adjudicate the children in need of assistance on these grounds. Additionally, the State asserted in the CINA petition that the children were in need of assistance pursuant to Iowa

order, legal custody of the children was ordered to remain with the mother subject to HHS supervision. The juvenile court also ordered the mother to submit random drug screens at HHS's request, to obtain a mental-health evaluation, and participate in all HHS recommended services.

A dispositional hearing was subsequently held in January 2025. At the beginning of the hearing, the State informed the juvenile court that:

> Your Honor, frankly, the State is a little bit at a loss as far as what to do in this case. The mother has refused to meet with the Department of Human Services since the handoff from the child protection worker, which would have been back, I believe, last fall. She's refused to meet with the FCS provider. So we have no assurances that the girls are safe. Granted, they are older and somewhat more able to self-protect. But the mother has also not consented to the Department allowing access to the girls, either at school or maybe at their place of work.
> So at this point, nobody's had eyes on these children since the case was filed. We have offered many times to have the mother do a hair test, and if that hair test is clean, that we would consider, you know, suspending things or even dismissing the petition. She's continued to refuse to do that, which is a concern to us, so we're at a little bit of a loss here.

The juvenile court issued a ruling following the dispositional hearing, concluding the children remained in need of assistance. Custody of the children was ordered to remain with the mother. Additionally, the mother was again ordered to submit random screens at the HHS's request and to participate in all recommended services.

This appeal followed.

---

Code section 232.96A(16). Similarly, the juvenile court determined the evidence was insufficient to adjudicate the children in need of assistance on this ground.

## II.    Standard of Review

"CINA proceedings are reviewed de novo."  *In re H.W.*, 961 N.W.2d 138, 141 (Iowa Ct. App. 2021).  "We are not bound by the juvenile court's factual findings, but give them weight, especially when credibility is at issue."  *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002).  CINA determinations must be supported by clear and convincing evidence.  *H.W.*, 961 N.W.2d at 141.  "Evidence is 'clear and convincing' when there are no 'serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence.'"  *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (citation omitted).  Our primary concern is the best interests of the children.  *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001).

## III.    Analysis

The mother makes two arguments on appeal.  First, she contends "the State failed to prove the grounds for adjudication by clear and convincing evidence."  Second, she asserts the juvenile court's dispositional order was not warranted because the children are not in need of assistance.

We address each argument separately.

## A. Ground for Adjudication

To adjudicate a child in need of assistance pursuant to Iowa Code section 232.96A(3)(b), the State must prove a child "has suffered or is imminently likely to suffer harmful effects as a result" of a parent's failure "to exercise a reasonable degree of care in supervising the child."

The mother contends the State did not establish by clear and convincing evidence that the children suffered or were "imminently likely" to suffer "harmful effects" from her level of supervision.  She asserts "neither child is experiencing ill

effects from [her] parenting." She notes "both children do well in school, are well adjusted, and one of them has a job." She also suggests that, due to the children's age, they require less supervision. We disagree with the mother and conclude the ground for adjudication was established by clear and convincing evidence.

"Harmful effects" under section 232.96A(3)(b) "pertains to the physical, mental, or social welfare of a child." *In re J.S.*, 846 N.W.2d 36, 41 (Iowa 2014) (citation omitted). "Because of this broad definition, [our courts] have found such effects are established when there was harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur." *Id.* at 41–42. In CINA cases, we liberally interpret the phrase "imminently likely" and do not require a showing that harm "be on the verge of happening before adjudicating a child as one in need of assistance." *In re L.H.*, 904 N.W.2d 145, 150 (Iowa 2017) (citation omitted).

Applying these principles, we find the State proved by clear and convincing evidence that the children were "imminently likely" to suffer "harmful effects" due to the mother's methamphetamine use. The mother has a lengthy history of using methamphetamine and tested positive for the drug while this case was pending. Further, Pansegrau—a former substance-use counselor—noted the mother displayed typical behavioral indicators of methamphetamine use during their conversation on March 26. Of note, this was immediately after she had driven and dropped her children off at school. The evidence firmly establishes that the children were likely to suffer harmful effects due to the mother's methamphetamine use as their caretaker.

And although the children are both teenagers and potentially better equipped to self-protect themselves, they rely on the mother for housing, food, and transportation. Our courts have long recognized that a parent's active methamphetamine use creates serious safety risks for children's well-being. *See J.S.*, 846 N.W.2d at 37 ("We have no difficulty concluding . . . that a parent's methamphetamine addiction by itself can result in "harmful effects" to the child."); *see also In re J.P.*, No. 19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) ("A parent's methamphetamine use, in itself, creates a dangerous environment for children).[5] And the fact that the children are currently doing well does not mean they are not "imminently likely" to suffer "harmful effects" due to the mother's impaired supervision while she is using methamphetamine. *See L.H.*, 904 N.W.2d at 150.

Accordingly, we find the ground for adjudication was established by clear and convincing evidence.

---

[5] The mother suggests in her petition that a single positive test for methamphetamine is not sufficient to adjudicate a child in need of assistance pursuant to section 232.96A(3)(b). True, two of our unpublished cases suggest that a positive test for methamphetamine by itself does not necessarily mean a child should be adjudicated in need of assistance pursuant to section 232.96A(3)(b). *See In re L.L.*, No. 18-0776, 2018 WL 3302163, at *2 (Iowa Ct. App. July 5, 2018) (reversing an adjudication under then section 232.96A(3)(b), where the mother tested positive for methamphetamine but subsequently participated in substance-use services and provided numerous negative drug tests); *see also In re K.K.*, No. 15-2110, 2016 WL 1703141, at *2 (Iowa Ct. App. Apr. 27, 2016) (determining an adjudication under then section 232.96A(3)(b) was inappropriate, where the mother tested positive for methamphetamine but participated in substance-use services and subsequently provided negative drug tests). This case is distinguishable because the mother tested positive for methamphetamine *and* has failed to drug test and participate in HHS recommended services. And while the mother did obtain a substance-use evaluation, she failed to disclose to her evaluator that she recently tested positive for methamphetamine. Thus, we put little stock in that evaluation.

**B. Dispositional Order**

The mother also argues the juvenile court should have declined to enter a dispositional order and dismissed the CINA-action because the children were no longer in need of assistance. The mother contends "any potential issues that may have arguably caused harm to the children were resolved by the time the court entered a disposition order." She adds that "there is no new or supporting evidence that [she] has a drug problem or that such a problem is having a negative impact on the children." We disagree.

As mentioned above, the State established by clear and convincing evidence that the children were in need of assistance pursuant to Iowa Code section 232.96A(3)(b) due to the mother's methamphetamine use. At the time of the disposition hearing, the mother had a previous positive test for methamphetamine and failed to address concerns over her substance use. During the hearing, the State informed the juvenile court that the mother had refused to cooperate with services and HHS drug test requests. We presume the mother's failure to comply with drug test requests made by HHS would have resulted in positive tests for methamphetamine. *See In re I.J.*, No. 20-0036, 2020 WL 1550702, at *2 (Iowa Ct. App. Apr. 1, 2020) ("We presume these missed drug tests would have resulted in positive tests."). Given the valid safety concerns over the mother's active use of methamphetamine, we cannot conclude the juvenile court erred by entering a dispositional order confirming the children remain in need of assistance. *See K.N.*, 625 N.W.2d at 734 ("[W]e have consistently observed that a juvenile court may not terminate a CINA adjudication status unless the purposes

of the original dispositional order have been fulfilled and 'the child is no longer in need of supervision, care, or treatment.'" (citation omitted).

Accordingly, we conclude the juvenile court properly entered a dispositional order finding that the children remained in need of assistance.

## IV. Conclusion

In sum, we affirm the juvenile court's adjudicatory and dispositional orders.

**AFFIRMED.**