# IN THE COURT OF APPEALS OF IOWA

No. 25-0108
Filed July 23, 2025

IN THE INTEREST OF L.T. and E.N.,
Minor Children,

B.T., Mother,
      Appellant.

_____

Appeal from the Iowa District Court for Carroll County, Joseph McCarville, Judge.

A mother appeals the juvenile court order adjudicating her two minor sons as children in need of assistance. **AFFIRMED.**

Joel Baxter of Baxter & Wild Law Office, PC, Guthrie Center, for appellant mother.

Brenna Bird, Attorney General, and Tamara Knight, Assistant Attorney General, for appellee State.

Jessica L. Morton of Bruner, Bruner, Reinhart & Morton, LLP, Carroll, attorney and guardian ad litem for minor children.

Considered without oral argument by Schumacher, P.J., and Buller and Sandy, JJ.

**SANDY, Judge.**

A mother appeals the juvenile court order adjudicating her two minors sons as children in need of assistance (CINA). The mother contends the evidence was insufficient to support the statutory ground for adjudication.

Upon our de novo review of the record, we affirm.

## I. Background Facts and Proceedings

L.T. and E.N. are the children at issue in this appeal. L.T. was born in 2017, and E.N. was born in 2021. The children have different fathers but share the same mother. The children's mother has an extensive history of methamphetamine use, which has previously brought her to the attention of the Iowa Department of Health and Human Services (HHS). In 2018, L.T. was removed from the mother's custody due to her use of methamphetamine. Commendably, the mother was able to achieve sobriety and that case successfully closed via reunification.[1]

But in June 2024, HHS received reports that the mother had recently resumed using methamphetamine. After receiving these allegations, Chad Tedrow—a HHS social worker—opened a child abuse assessment and began an investigation of the mother. Despite reaching out to the mother through numerous channels, Tedrow was unable to contact her during his investigation. However, during the course of his investigation, Tedrow spoke extensively with the children's maternal grandparents and E.N.'s father. The maternal grandparents reported that they had recently observed the mother displaying what they described as

---

[1] However, as a part of this case, L.T.'s father's parental rights were terminated.

behavioral indicators of methamphetamine use, such as "fits of rage, lack of providing for [L.T.'s] overall needs," and reconnecting with L.T.'s father.[2]

E.N.'s father also expressed concern that the mother had relapsed with methamphetamine. He told Tedrow that E.N. frequently appeared to be "drained of energy" when he returned from the mother's care. Additionally, he relayed to Tedrow that he was worried that E.N. "was being exposed to drugs" by the mother. At the time of Tedrow's investigation, L.T. was primarily living with the maternal grandparents through an informal arrangement,[3] while E.N. lived primarily with his father.

Tedrow's investigation into the allegations resulted in a founded child abuse assessment against the mother for use of dangerous substances and denial of critical care. Shortly after Tedrow issued his founded assessment, the State filed CINA petitions for both children on July 30. But the State did not seek removal of the children from the mother's custody. At the adjudication hearing, Tedrow explained that he did not believe immediate removal from the mother's custody was necessary because both children were primarily living outside of her household.

However, on August 1, the mother—without warning—showed up to the maternal grandparents' home and demanded that L.T. be returned to her care. The maternal grandparents acceded to this demand, and the mother left with L.T. Two days later, Tedrow received a call from the maternal grandfather, informing

---

[2] Although it is not entirely clear from the record, it appears L.T.'s father has a history of methamphetamine use.

[3] This was an informal arrangement because the mother—at that time—had legal custody and physical care of L.T.

him that L.T. had been found outside of the mother's neighbor's home crying and complaining of hunger. After discovering the child outside of her home, the neighbor called the maternal grandfather to have him come pick up L.T.

Following the call from the maternal grandfather, Tedrow contacted the Carroll County Sheriff's Office and requested that an officer meet him at the mother's home. Tedrow and two sheriff's deputies—Gunnar Gillard and Andrew Smaldone—arrived at the mother's house at around 2:00 p.m. After a brief discussion with Tedrow, Deputy Gillard knocked on the mother's front door. According to Tedrow's testimony at the adjudication hearing, the mother opened the door and appeared "groggy" and "pale." Tedrow added that the mother was "very skinny, distraught, [and] didn't know what was going on initially when she came outside the household." As he explained in his testimony, Tedrow has received extensive training to identify indicators and signs of substance use. Based on this training, his conversations with the mother's family, and his interaction with the mother outside of her home, he formed the belief that she was actively using methamphetamine.

When asked by Deputy Gillard where L.T. was, the mother responded that he was in her home. Deputy Gillard then asked if he and Deputy Smaldone could conduct a sweep of the home to confirm whether L.T. was there. The mother didn't respond to this question and attempted to retreat inside the home. Deputy Gillard blocked the mother from shutting the door, and he and Deputy Smaldone entered the home to search for L.T. After confirming L.T. was not in the home, the deputies informed the mother of this news. Tedrow testified that the mother showed virtually no concern that her son was not present in her home. Additionally, in a written

report submitted to the juvenile court, Tedrow wrote that he observed Deputy Gillard "point to drug paraphernalia by a chair" in the mother's home.

Tedrow was able to eventually confirm with the maternal grandfather that L.T. was with him. Tedrow subsequently asked the maternal grandfather if he could meet with him and L.T. at a local park. Tedrow left the mother's home and drove to the park to speak with L.T. During their conversation at the park, L.T. disclosed to Tedrow that he had witnessed the mother "smoke[] her medicine in a bowl" while he was in her care. L.T. even drew a picture of what he had seen. According to Tedrow's report, L.T. drew a picture of a bowl and stated he saw the mother "suck in" and "blow smoke out."

On August 5, the State filed an application requesting temporary removal of the children from the mother's custody. The juvenile court granted this request, and the children were placed in the temporary custody of HHS "for placement commensurate with the child[ren's] needs." L.T. was placed with the maternal grandparents, while E.N. was placed with his father. A contested removal hearing was held on August 14, after which the juvenile court entered an order directing that removal from the mother's custody continue. An adjudication hearing on the State's CINA petitions was subsequently set for November 7. Of note, in the time between removal and the adjudication hearing, the mother refused to participate in any HHS recommended services. This included numerous requests for the mother to drug test.

During the adjudication hearing, the juvenile court heard testimony from Tedrow, the mother, and Albina Tigges—the HHS case manager assigned to the family. The juvenile court also heard testimony from Carroll County Sheriff's

Deputy Nick Johnson, who had been investigating the mother for several months prior to the hearing for alleged methamphetamine distribution. Deputy Johnson testified that, just a few days prior to the hearing, he had been involved in a traffic stop of the mother in which drugs and drug paraphernalia were found in the vehicle she was operating. According to him, the mother had been initially pulled over by an officer for operating a vehicle with a fraudulent license plate and registration. Due to the car's fraudulent license plate and improper registration, the vehicle was impounded and an inventory search was conducted. During the search of the vehicle, a digital scale covered in white residue was found near the front passenger seat. Deputy Johnson testified that he strongly believed the white residue on the scale was from methamphetamine. As he put it, "[l]ike I said, based on my training and experience methamphetamine has a significant—you can tell it's meth and for it to be found on a scale, I have no doubt its methamphetamine."

Further, a container with marijuana was found in the backseat of the vehicle. As Deputy Johnson explained:

> In the back seat there was a large, I would call it like a Ziploc container that you could purchase from a legal store or whatever, not—I mean, it was probably gallon size, maybe half gallon size but it maybe had a couple grams of marijuana left in it.

Deputy Johnson also testified that he has received training to identify indicators of when an individual is under the influence of methamphetamine. He saw several indicators that led him to believe the mother was under the influence of methamphetamine at the time of the traffic stop. In his words:

> So, like I said, I was the backup officer so I wasn't involved in the traffic stop but as the tow truck arrived, [the mother] stepped out of the vehicle, or I guess let me back up just a little bit. When the officer was giving her citations and requesting for her to provide her

signature it was—he had to tell her several times what was going on. She was having a difficult time of paying attention to what was happening, so that's big. I mean, hard time focusing on what's going on, seems like they jump from one thing to the next, you know, your—she had glossy eyes. I believed that she was under the influence at that time.

Following the hearing, the juvenile court issued its order adjudicating the children in need of assistance pursuant to Iowa Code section 232.96A(3)(b) (2024).[4] The juvenile court ordered that temporary custody of L.T. remain with HHS for purposes of placement with a relative. As for E.N., the juvenile court ordered that he be placed in the temporary custody of his father. A dispositional hearing was held on January 8, 2025.[5] Following this hearing, the juvenile court entered an order determining that the children remained in need of assistance and provided that the children's temporary custodial arrangements would continue.

This appeal followed.

---

[4] In its adjudicatory order, the juvenile court dismissed the State's asserted grounds for adjudication under Iowa Code section 232.96A(14) and (16). Subsection (14) provides that a child may be adjudicated in need of assistance if the "[c]hild's parent, guardian, or custodian suffers from a mental incapacity, a mental condition, imprisonment, or drug or alcohol abuse that results in the child not receiving adequate care or being imminently likely not to receive adequate care." Iowa Code § 232.96A(14). Subsection (16) provides that a child may be adjudicated in need of assistance if a parent, guardian, or custodian does any of the following:

(a) Unlawfully uses, possesses, manufactures, cultivates, or distributes a dangerous substance in the presence of a child.
(b) Knowingly allows the use, possession, manufacture, cultivation, or distribution of a dangerous substance by another person in the presence of the child.
(c) Possesses a product with the intent to use the product as a precursor or an intermediary to a dangerous substance in the presence of a child.

Id. § 232.96A(16)(a)–(c).
[5] Between the adjudicatory and dispositional hearings, the mother tested positive for methamphetamine on November 18.

## II.    Standard of Review

"CINA proceedings are reviewed de novo." *In re H.W.*, 961 N.W.2d 138, 141 (Iowa Ct. App. 2021). "We are not bound by the juvenile court's factual findings, but give them weight, especially when credibility is at issue." *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002). CINA determinations must be supported by clear and convincing evidence. *H.W.*, 961 N.W.2d at 141. "Evidence is 'clear and convincing' when there are no 'serious or substantial doubts as to the correctness or conclusions of law drawn from the evidence.'" *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (citation omitted). Our primary concern is the best interests of the children. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001).

## III.    Analysis

To adjudicate a child in need of assistance pursuant to Iowa Code section 232.96A(3)(b), the State must prove a child "has suffered or is imminently likely to suffer harmful effects as a result" of parent's failure "to exercise a reasonable degree of care in supervising the child."

On appeal, the mother argues the State failed to establish by clear and convincing evidence that the children suffered or were imminently likely to suffer harmful effects due to her failure to exercise a reasonable degree of supervision. She contends that, "[w]hile noting that there were concerns about [her] having relapsed on methamphetamine, the [c]ourt dismissed grounds related to addiction or substance abuse." Instead, she observes that the juvenile court—in its adjudication order—primarily focused on the fact that L.T. wandered off to a neighbor's home to support its ruling finding the children to be in need of assistance pursuant to section 232.96A(3)(b). However, she claims there is "little or no

evidence [to] support a finding that L.T. has suffered a harm." She also claims the evidence was insufficient to establish that L.T. was "imminently likely" to suffer "harmful effects" by wandering away from her home. Finally, she contends "there is zero" evidence to support a finding that E.N. suffered a harm or was imminently likely to suffer harm by her alleged failure to properly supervise L.T. We disagree.

As an initial matter, we find the mother's argument regarding the juvenile court's dismissal of two of the State's asserted statutory grounds for adjudication relating to substance use and addiction to be a red herring. It is well-established that a parent's use of methamphetamine can result in an adjudication pursuant to section 232.96A(3)(b). *See In re J.S.*, 846 N.W.2d 36, 37 (Iowa 2014) ("We have no difficulty concluding . . . that a parent's methamphetamine addiction by itself can result in 'harmful effects' to the child, thereby justifying state intervention to protect the child."); *see also In re L.W.*, No. 25-0187, 2025 WL 1177700, at *5 (Iowa Ct. App. Apr. 23, 2025) (affirming the juvenile court's order adjudicating two children in need of assistance pursuant to section 232.96A(3)(b) due to the mother's methamphetamine use). And the ultimate question is whether the evidence presented was sufficient to establish the statutory ground for adjudication, not whether the evidence the juvenile court chose to discuss in its ruling was sufficient.

With this in mind, we move on to further grapple with the mother's argument. "Harmful effects" under section 232.96A(3)(b) "pertains to the physical, mental, or social welfare of a child." *J.S.*, 846 N.W.2d at 41 (citation omitted). "Because of this broad definition, [our courts] have found such effects are established when there was harm to a child's physical, mental, or social well-being or such harm was

imminently likely to occur." *Id.* at 41–42. In CINA cases, we have liberally interpreted the phrase "imminently likely" and do not require a showing that harm "be on the verge of happening before adjudicating a child as one in need of assistance." *In re L.H.*, 904 N.W.2d 145, 150 (Iowa 2017) (citation omitted).

Applying these principles, we conclude the State proved by clear and convincing evidence that the children were "imminently likely" to suffer "harmful effects." The evidence is compelling that the mother is currently using methamphetamine. L.T. described in great detail what he observed while his mother used drugs in front of him. This fact was sadly confirmed by the mother's positive test for methamphetamine shortly after the adjudication hearing. The children in this case are too young to protect themselves from the dangers that a parent struggling with methamphetamine use present. They deserve and require a sober parent to safely supervise and care for them. And we have previously recognized that a parent's methamphetamine use creates danger for children under their supervision. *See In re J.P.*, No. 19-1633, 2020 WL 110425, at *2 (Iowa Ct. App. Jan. 9, 2020) ("A parent's methamphetamine use, in itself, creates a dangerous environment for children."). Further troubling, when alternative arrangements were made to ensure L.T. would not be in his mother's care while she was actively using or under the influence of methamphetamine, she lacked the prudence and foresight to self-adhere to those boundaries. And because E.N.'s father has no custodial order in place, the same concerns would naturally extend to him.

Accordingly, we find the statutory ground for adjudication was established by clear and convincing evidence with respect to both children. *See L.W.*, 2025

WL 117700, at *4 (finding the State established that the children were "imminently likely" to suffer "harmful effects" due to the mother's methamphetamine use).[6]

## IV. Conclusion

In sum, we affirm the juvenile court's adjudicatory order.

**AFFIRMED.**

---

[6] The mother also argues that the juvenile court erred in finding that its aid was necessary. *See* Iowa Code § 232.96(8) (providing that if the "court concludes that its aid is not required in the circumstances, the court shall dismiss the petition"). However, from our review of the record, it appears that this argument was never presented to the juvenile court. Nor was it ruled on. Consequently, this issue has not been preserved for our review. *In re Est. of Laube*, No. 20-1399, 2022 WL 108937, at *5 (Iowa Ct. App. Jan. 12, 2022) (per curiam) ("Error preservation generally involves two steps: (1) properly raising the issue before the district court and (2) obtaining a ruling.").