IN the INTEREST OF
L.H., Minor Child,

R.H., Father, Appellant,

No. 17-0920

Supreme Court of Iowa.

Filed November 17, 2017

Mark J. Neary of Neary Law Office, Muscatine, for appellant.

Thomas J. Miller, Attorney General, and Mary A. Triick (until withdrawal) and Kathryn K. Lang, Assistant Attorneys General, for appellee.

Sara Strain Linder of Bray & Klockau, P.L.C., Iowa City, guardian ad litem, for minor child.

ZAGER, Justice.

This further review requires us to determine whether a father's physical abuse against other family members, and his history of domestic violence, without physical abuse against the child, supports an adjudication of the child as one in need of assistance. The juvenile court determined that the parent is "imminently likely to abuse or neglect the child" and that the child "is imminently likely to suffer harmful effects" due to a "failure of the child's parent … to exercise a reasonable degree of care in supervising the child." See Iowa Code § 232.2(6)(*b*), (*c*)(2) (2016). The court of appeals reversed the juvenile court adjudication of the child as a child in need of assistance, finding the father's physical abuse towards other family members did not establish that the child was at risk of imminent harm. We granted the State and guardian ad litem's application for further review. In our de novo review, we conclude the record supports the juvenile court adjudication of the child as a child in need of assistance. We therefore vacate the decision of the court of appeals and affirm the judgment of the juvenile court.

## I. Background Facts and Proceedings.

Danielle is the mother of ten-year-old A.D., four-year-old G.G., and two-year-old L.H. Each child has a different father, but Danielle is currently involved with the father of L.H., Ryan. Danielle and Ryan have been in a relationship for approximately three years and have resided together intermittently during this time. In June 2016, the Iowa Department of Human Services (DHS) became involved following an alleged incident of physical abuse in which Ryan grabbed A.D. by the neck and slammed him up against a wall after Ryan became upset with A.D. for locking the bathroom door. Danielle did not observe the assault. However, she could hear yelling and then observed A.D. on the floor crying and holding his head. Following the incident, Danielle called 911 and took A.D. to the hospital. The treating physician diagnosed A.D. with a subdural hematoma. L.H. did not witness this event.

At the time of the alleged incident, Danielle and the children resided with her father in Atalissa during the week. However, Danielle and the children spent most weekends with Ryan at his residence in Davenport. At no time during this period

were Danielle and Ryan separated. Following this incident, DHS took follow-up measures to investigate the abuse allegation and the safety of all of Danielle's children. As part of these efforts, DHS spoke with Danielle at length about her relationship with Ryan. Danielle reported that Ryan had grabbed A.D. by the neck once before and had done things that "scare" them in the past. She noted that Ryan has anger issues that she has spoken to him about and that Ryan agreed he needed help to address his anger issues. However, Ryan never took any action to resolve those anger issues. After its investigation, DHS determined the incident was a founded case of child abuse with Ryan as the perpetrator.

Danielle also reported that Ryan has a history of domestic violence. On May 7, 2015, Danielle had to go to the hospital after Ryan kicked her in the head. Additionally, during a family safety, risk, and permanency visit with Danielle in December 2016, a social worker observed "extreme bruising on [Danielle's] face," including broken blood vessels in her right eye, two black eyes, and bruises along her forehead and cheeks. Danielle told the social worker that her black eyes were the result of a snowball and that her facial bruising occurred when she tripped over a toy and hit a door. The social worker also noticed a bump on L.H.'s head, which Danielle said occurred when L.H. fell off a chair. The social worker noted "severe concerns for the presence of domestic violence in the home." Danielle later acknowledged at the adjudicatory hearing for L.H. that she reported domestic violence in her relationship with Ryan in both 2015 and 2016.

In addition to Ryan's history of domestic violence with Danielle, the DHS social history report on L.H. shows Ryan also has a history of domestic violence in previous relationships with other women. Ryan has been the subject of two protective orders with two former partners. In 2007, he was named the perpetrator of abuse of one of his other children when he struck the child's mother hard enough that she fell while holding the child. Specifically, that mother reported Ryan had been drinking and driving with the child in the car. When they returned home, the mother went into the bathroom and Ryan kicked in the door to assault the mother. The mother reported that Ryan assaulted her three other times.

Throughout the DHS investigation into the safety of L.H., Ryan was noncooperative. The family's assigned service provider testified that she made multiple attempts to contact Ryan, but she was unable to reach him. Ryan refused to even talk with DHS and did not participate in any discussions regarding a safety plan for L.H. Ryan refused to cooperate with the preparation of the social history for L.H., even after being ordered by the court to appear and answer questions. Ryan refused to answer any questions related to the social history prepared for L.H. when given the opportunity in court. Ryan was not part of any safety plan implemented by DHS for the protection of L.H., and he did not participate in any services offered by DHS.

As the DHS investigation progressed, Danielle also became less cooperative. She refused to allow DHS to meet alone with the children unless the meetings were court-ordered. She also began to qualify and modify her earlier statements about the incident between A.D. and Ryan. Danielle testified that she thought perhaps A.D. had just "fallen backwards into the door." The guardian ad litem noted Danielle's lack of cooperation appeared influenced by Ryan. For example, within thirty minutes of the child protective worker's contact with Ryan regarding the incident

with A.D., Danielle called the child protective worker to soften her previous statements about Ryan.

On January 13, 2017, the juvenile court held a contested adjudicatory hearing in the interest of L.H. and Danielle's other children. A DHS worker testified that the mother and father were uncooperative with DHS. Further testimony revealed that DHS had been unable to meet with Ryan since the June 2016 incident because he would not respond to phone calls or letters from DHS. Additionally, a DHS worker testified Ryan refused to submit social history to DHS, refused to answer any questions DHS asked at the hearing, and refused to cooperate with paternity testing. Danielle testified that A.D. might have "exaggerated" the June incident. The assistant county attorney told the juvenile court that she was unsure she could "assure the safety of these children based on the [existing] adjudication ... and the complete lack of cooperation with services" from Ryan and Danielle. On February 23, the juvenile court found clear and convincing evidence that Ryan assaulted A.D. in June 2016. The court issued an order adjudicating L.H. and his half-siblings as children in need of assistance (CINA) pursuant to Iowa Code section 232.2(6)(b) and (c)(2), noting,

> It is clear the mother is aware [Ryan] has anger issues that are not addressed, that have resulted in assault to one of her children, and that she will continue a relationship with [Ryan] which will result in them living in the same household on a full time or intermittent basis exposing the children to the imminent likelihood of abuse and a failure to provide appropriate supervision.

The juvenile court left L.H. and his half-siblings in Danielle's care.

On April 20, the juvenile court held a dispositional hearing. Following the hearing, the juvenile court issued an order confirming L.H. is a child in need of assistance, stating, "It is clear that [L.H.'s parents] will continue to have a relationship and live together. All of the children will be supervised by Ryan.... Ryan ... has unaddressed anger issues that present a danger to the children if not addressed." The juvenile court left the children in Danielle's custody, subject to DHS supervision. It also ordered Ryan to undergo paternity testing, which later confirmed that Ryan is the biological father of L.H. The juvenile court further ordered Ryan to undergo a mental health evaluation and to participate in parenting classes, domestic violence education, and anger management counseling. The juvenile court similarly ordered Danielle to participate in the same parenting classes and domestic violence education, and it authorized DHS to meet with the children alone one time each month.

Ryan appealed the juvenile court adjudication of L.H. as CINA on the grounds that the State failed to prove that Ryan was "imminently likely to abuse or neglect the child" under Iowa Code section 232.2(6)(b), or that L.H. was at a risk of harm due to his lack of parental supervision under Iowa Code section 232.2(6)(c)(2).[1] On July 19, the court of

---

1. Ryan also argued that the juvenile court erred in adjudicating L.H. CINA since L.H. did not reside with him because L.H.'s primary residence was with his mother. However, both Iowa Code section 232.2(6)(b) and section 232.2(6)(c)(2) apply to a parent who is "imminently likely to abuse or neglect the child" or cause the child to suffer harmful effects as a result of the parent's failure "to exercise a reasonable degree of care in supervising the child." *See* Iowa Code § 232.2(6)(b), (c)(2). Since Ryan is L.H.'s biological father, the fact that L.H. has multiple residences is inconsequential. Thus, we need not address Ryan's residential argument as related to the CINA proceedings in this case.

appeals reversed the juvenile court adjudication of L.H., stating,

> The State and L.H.'s guardian ad litem argue L.H. is [at] risk of imminent harm based on the father's pattern of abusive behavior and unaddressed anger issues. Their argument relies on the assumption the mother will place L.H. under the supervision of the father, whose anger issues make abuse imminently likely. There is no evidence L.H. has been assaulted and no evidence the child witnessed a domestic abuse assault between the mother and father.
>
> . . . .
>
> The father has demonstrated aggressive behavior towards his family. The father has a documented child-abuse report against L.H.'s half-sibling, and the record suggests another incident of abuse occurred since it was discovered L.H.'s mother had two black eyes. Yet clear and convincing evidence is lacking as to L.H.'s risk of imminent harm. *Protective measures were put in effect, including the mother's care of the children in a different residence. Although L.H. may be at risk of harm, the supporting evidence is not clear.*

(Emphasis added.). The State and guardian ad litem sought further review, which we granted.

## II. Standard of Review.

■ "We review CINA proceedings de novo." *In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). While we are not bound by the · juvenile court's factual findings, we accord them weight. *Id.* Under Iowa Code section 232.96(2), the State bears the burden of proving its allegations by clear and convincing evidence. *See* Iowa Code· § 232.96(2). "Clear and convincing evidence" exists "when there are no 'serious or substantial doubts as to the correctness [of] conclusions of law drawn from the

evidence.'" *In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) (quoting *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000)). Ultimately, our principal concern is the best interests of the child. *In re J.S.*, 846 N.W.2d at 40. In determining the best interests of the child, "we look to the parent['s] past performance because it may indicate the quality of care the parent is capable of providing in the future." *In·re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006) (quoting *In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997)).

## III. Analysis.

The State and· guardian ad litem argue that the juvenile court correctly determined that L.H. is a child in need of assistance. They argue Danielle will continue to place L.H. under Ryan's supervision since she· made clear that she will continue to be in a relationship with Ryan and that she and L.H. will continue to reside with Ryan on the weekends. Further, they contend the juvenile court determination was correct because Danielle and Ryan have not taken protective measures to ensure the safety of L.H. given their refusal to cooperate with DHS.

**A. State Jurisprudence Establishing the Definition of "Imminently Likely" in CINA Cases.** The CINA adjudication of L.H. rests on Iowa Code sections 232.2(6)(*b*) and (*c*)(2). Under Iowa Code section 232.2(6)(*b*), the CINA adjudication requires ·a determination that a "parent, guardian, other custodian, or other member of the household in which the child resides has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." Iowa · Code § 232.2(6)(*b*). The statute defines "physical abuse or neglect" as "any nonaccidental physical injury suffered by a child as the result of the acts or omissions of the child's parent, guardian, or custodian or other person legally responsible for the

child." *Id.* § 232.2(42). Iowa Code section 232.2(6)(*c*)(2) provides that a child may be adjudicated CINA when the child "has suffered or is imminently likely to suffer harmful effects" due to a "failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child." The use of "harmful effects" in this context "pertains to the physical, mental, or social welfare of a child." *In re J.S.*, 846 N.W.2d at 41 (quoting *In re Wall*, 295 N.W.2d 455, 458 (Iowa 1980)).

In *In re J.S.*, we looked at our previous decisions defining "imminent" for guidance in defining "imminently likely" in the CINA context. *Id.* at 43. We noted that we have previously defined "imminent" in the self-defense context "to mean 'ready to take place,' 'near at hand,' 'hanging threateningly over one's head,' and 'menacingly near.'" *Id.* (quoting *State v. Shanahan*, 712 N.W.2d 121, 142 (Iowa 2006)). We also described how we relied on this same definition to explain "that 'imminent' means a threatened act 'is impending or about to occur'" in another case. *Id.* (quoting *State v. Lane*, 743 N.W.2d 178, 182 (Iowa 2007)). Further, we stated, "'Imminent' has also been defined to mean 'on the point of happening.'" *Id.* (quoting *Black's Law Dictionary* 750 (6th ed. 1990)).

However, we liberally interpret the phrase "imminently likely" in CINA cases, so "we do not require neglect or physical or sexual abuse to be on the verge of happening before adjudicating a child as one in need of assistance." *Id.* at 43. Rather, "[c]hild protection statutes 'are designed to prevent probable harm to the child and do not require delay until after harm has occurred.'" *Id.* (quoting *In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990)). To illustrate, we have previously upheld the CINA adjudication of an eight-year-old

boy under Iowa Code section 232.2(6)(*d*) where the record showed the father "exceeded all bounds of sexual propriety between himself, his daughter and her eight-year-old friend" yet did not exceed those bounds with the boy. *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002). In that case, the boy denied that his father had ever inappropriately touched him. But the father admitted to climbing into the bathtub to encourage his young daughter and her friend "to soap his chest and stomach and then slide down his body," and the daughter admitted that this activity had occurred on other occasions. *Id.* at 360–61. In finding that the boy was in imminent danger, we took note of "the common sense notion that, ordinarily, all siblings are at risk when one child has been sexually abused." *Id.* at 362.

We have similarly upheld a CINA adjudication where the child was "imminently likely to be abused or neglected by her mother or maternal grandparents." *In re A.M.H.*, 516 N.W.2d 867, 872 (Iowa 1994). This was based on DHS reports showing the grandparents' involvement with multiple incidents of physical and sexual abuse, as well as the mother's failure to pursue Title XIX coverage or mental health treatment. *Id.* at 872–73. In contrast, we have found a mother's status as an active methamphetamine addict, without more, was insufficient to support a finding that the child was "imminently likely to suffer physical harm under [Iowa Code] section 232.2(6)(*b*)." *In re J.S.*, 846 N.W.2d at 42. This determination was largely because the mother had no prior history of abuse or neglect of the children, and the children's grandmother had stepped in to care for the children when the mother was unable to handle her parenting responsibilities. *Id.* Nonetheless, we did uphold the juvenile court CINA adjudication in *In re J.S.* under Iowa Code section 232.6(*c*)(2), holding that "a juvenile court could reason-

ably determine that a parent's active addiction to methamphetamine is 'imminently likely' to result in harmful effects to the physical, mental, or social wellbeing of the children in the parent's care." *Id.*

■ Ultimately, our precedent governing the imminent likelihood of abuse establishes that neglect or physical or sexual abuse need not "be on the verge of happening before adjudicating a child as one in need of assistance" under Iowa Code section 232.2(6)(*b*). *Id.* at 43. "Nor should we require that showing." *Id.*

■ **B. CINA Adjudication for L.H.** Upon our de novo review of the record, we conclude that there is clear and convincing evidence to show that L.H. is a child in need of assistance as to Ryan under both Iowa Code section 232.2(6)(*b*) and section 232.2(6)(*c*)(2). First, the State presents clear and convincing evidence that Danielle will continue to place L.H. under Ryan's supervision, thereby making it imminently likely that L.H. will be subject to abuse as required to adjudicate L.H. a child in need of assistance under Iowa Code section 232.2(6)(*b*). Danielle testified at the adjudicatory hearing that she and L.H. would continue to live with Ryan at Ryan's residence on the weekends. She also testified that she keeps some of L.H.'s clothing at Ryan's residence to avoid having to pack and move it back and forth when she goes between Ryan's residence and her father's residence. Further, Ryan is L.H.'s father, and there is no custody order in place preventing him from having L.H. in his care. The only person overseeing whether L.H. resides in a different residence from Ryan is Danielle, who admittedly takes L.H. with her to stay with Ryan on the weekends.

Moreover, the record shows that Danielle did not move out of Ryan's residence as a protective measure for the safety of L.H. and her other children. In fact, Danielle had moved out of Ryan's residence well before the incident of abuse involving A.D. She testified that this move was due to a lack of space and the fact that having the children around interfered with Ryan's ability to focus on his schoolwork. As Danielle explained it, "[W]e were confined. Ryan was going to school. It was a little uneasy. It was kind of hard for him to want to focus on schooling with kids around."

Although the State does not present evidence showing that Ryan has ever physically abused L.H., the State does present evidence that Ryan has serious anger issues that have led him to physically abuse other current and previous members of his household. For example, the State presents clear and convincing evidence that Ryan has abused L.H.'s half-sibling, A.D., and that he was named the perpetrator of abuse of one of his other children after he struck the child's mother so hard that she fell to the ground while she was holding the child. Ryan has a history of domestic violence in which he has physically abused Danielle and other partners.

Danielle told DHS that the documented incident of abuse with A.D. was not the first time Ryan has grabbed A.D. by the neck. Danielle told DHS Ryan has anger issues that Ryan has acknowledged to her, and though she did not elaborate on specific events, she stated that Ryan has acted in the past in a manner that "scares" them. The record discloses that Ryan has done nothing to address his anger issues or his pattern of domestic violence. While the State concedes that there is no evidence that Ryan abused L.H., L.H. is a two-year-old child who cannot communicate whether he has been abused or has witnessed abuse in his household. Instead, he must rely on Danielle for protection from such abuse. The clear and convincing evidence shows both Ryan and Danielle are fully aware of

Ryan's unaddressed anger issues and pattern of domestic violence. Yet, Ryan and Danielle continue to minimize or deny the instances of abuse in the household, even the founded incident of abuse with A.D. They have both been uncooperative with DHS in its attempts to address Ryan's anger issues and pattern of domestic violence for the protection of L.H.

As we have previously held, "[c]hild protection statutes 'are designed to prevent probable harm to the child and do not require delay until after harm has occurred.'" *Id.* (quoting *In re L.L.*, ·459 N.W.2d at 494). Given Ryan's history of domestic violence and abuse towards other children, we have "no 'serious or substantial doubts as to the correctness [of the juvenile court's] conclusions of law drawn from the evidence" that Ryan is imminently likely to abuse L.H., thereby rendering L.H. a child in· need of assistance. *In re D.W.*, 791 N.W.2d at 706 (quoting *In re C.B.*, 611 N.W.2d at 492). Just as there were specific prior instances of sexual or physical abuse committed on other family members by a caregiver in both *D.D.* and *A.M.H.* to warrant CINA adjudications, *see In re D.D.*, 653 N.W.2d at 361–62; *In re A.M.H.*, 516 N.W.2d at 872–73, the State presents evidence of specific prior instances of physical abuse to other family members of L.H. that warrant the CINA adjudication in this case. This case is distinguishable from *In re J.S.* In that case, we held the children were not at imminent risk of abuse or neglect due to the mother's status as a methamphetamine addict under Iowa Code section 232.2(6)(b). *In re J.S.*, 846 N.W.2d at 42. That conclusion was primarily based on the lack of any evidence of specific prior instances of physical abuse ·or neglect. *See id.* Unlike the lack of any evidence of prior specific instances of abuse or neglect in *In re J.S.*, the record here discloses clear and convincing evidence of Ryan's ˙demonstrated

history of domestic violence and abuse. Therefore, our holding in this case aligns with our previous holdings liberally interpreting the phrase "imminently likely," and recognizing the "common sense notion" .that the parent's abuse of one child places the ·parent's other children in danger of abuse. *In ·re D.D.*, 653 N.W.2d at 362. L.H. is clearly a child in need of the juvenile court's assistance and protection from the risks of domestic violence by Ryan.

. A CINA adjudication provides DHS with the legal authority to implement protections for children, including a safety plan for this family. In this case, it could provide for supervised visitation with Ryan and require Ryan to address his anger issues. The State presented clear and convincing evidence that Ryan physically abused A.D., a member of L.H.'s immediate family. This abusive situation continues unabated as Ryan has refused to acknowledge or address the issues of his anger and pattern of domestic violence, even with the offer of services through DHS. With this history, there is clear and convincing evidence that Ryan is imminently likely to abuse L.H. Consequently, the juvenile court adjudication of L.H. as a child in need of assistance under Iowa Code section 232.2(6)(*b*) is supported by clear and convincing evidence.

■ Additionally, the State presents clear and convincing evidence that L.H. is "imminently likely to suffer harmful effects [due to a] failure of the child's parent ... to exercise a reasonable˙degree of care in supervising the child" as required for a CINA adjudication under Iowa Code section 232.2(6)(*c*)(2). L.H. has been and will continue to be exposed to Ryan's domestic violence. Danielle has made it clear that she has no intention of terminating her relationship with Ryan. She has also made

it clear that since the abuse of A.D., she and the children continue to spend almost every weekend with Ryan at his residence in Davenport. Contrary to the findings of the court of appeals, there are no protective measures that have been put into effect to protect L.H. The dispositional order placing custody of the children in the care of Danielle, ostensibly at a different residence, provides no protection considering the facts present here. L.H. will continue to be exposed to Ryan on a regular basis, making it imminently likely that L.H. will suffer harmful effects due to Ryan's unabated history of domestic violence. The cases cited by the court of appeals to the contrary, are thus clearly distinguishable. L.H. needs the services and supervision of the juvenile court for his protection from the risk of physical abuse and domestic violence that Ryan poses.

"Studies estimate that children living in a home with a batterer have a 70 percent chance of becoming the victim of abuse themselves. In addition, 40 percent of suspected child abuse involves a history of family violence." Amy Allen & Susan Myres, *The Impact of Domestic Violence on Children*, 42 Hous. Law. 18, 20 (Sept./ Oct. 2004) (footnote omitted). Further, "[c]hildren from violent homes may also experience impaired social competence and even post-traumatic stress disorder (PTSD)." Amy B. Levin, Comment, *Child Witnesses of Domestic Violence: How Should Judges Apply the Best Interests of the Child Standard in Custody and Visitation Cases Involving Domestic Violence?*, 47 UCLA L. Rev. 813, 832–33 (2000) (footnote omitted).

The State presents clear and convincing evidence of Ryan's abusive behavior and history of domestic violence. This history includes the report in which Ryan kicked Danielle in the head requiring her to visit a hospital. It also includes the time when he struck a former partner so hard that it knocked her down and caused her to drop their child. Danielle testified at L.H.'s adjudicatory hearing that she has reported domestic violence in her relationship with Ryan in both 2015 and 2016. The social history for L.H. also reveals that Ryan had two protective orders with two former partners. One of these partners reported Ryan assaulted her three other times in addition to the incident in which Ryan caused her to drop their child. Further, the DHS worker noted "severe concerns for the presence of domestic violence in the home" during a family safety, risk, and permanency visit with Danielle in December 2016, when she appeared bruised and battered.

The State's clear and convincing evidence also shows that Ryan and Danielle continue in their refusal to cooperate with DHS to develop the parenting skills necessary to parent L.H. safely. They both continue to minimize and/or deny the presence of domestic violence in their relationship. An important aspect of a parent's care for his or her child is to address his or her role in the abuse of the child. *See In re C.H.*, 652 N.W.2d 144, 150–51 (Iowa 2002) (noting that a "parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children" and upholding the termination of parental rights for a parent due to the parent's continuous refusal to comply with the case permanency plan). Ryan continues to put his own needs before those of L.H. by refusing to cooperate in any manner with DHS to address his role in the domestic violence and the imminent risk of harmful effects domestic violence creates for children who experience it in their household.

As the record shows, Ryan refused to make any contact with DHS despite its repeated attempts; he refused to partici-

pate in L.H.'s social history or answer any questions about it in court; and he refused to take a paternity test confirming he was the biological father of L.H. until he was court-ordered to do so. In addition to Ryan's refusal to cooperate, Danielle also has made clear that she will not cooperate with any DHS efforts to protect L.H. from Ryan unless it is court-ordered. Moreover, Ryan has declined to address his long-standing anger management issues and violent tendencies. Thus, Ryan refuses to meaningfully address the issues of abuse within the household that he shares with Danielle and L.H. Given Ryan's history of domestic violence, combined with his lack of participation throughout this process, the juvenile court was correct to adjudicate L.H. a child in need of assistance under Iowa Code section 232.2(6)(c)(2), based on the harmful effects the child is imminently likely to suffer due to Ryan's domestic violence.

## IV. Conclusion.

For the foregoing reasons, we vacate the decision of the court of appeals and affirm the juvenile court judgment that L.H. is a child in need of assistance under Iowa Code sections 232.2(6)(b) and (c)(2).

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**