# In the Iowa Supreme Court

No. 24–1879

Submitted April 15, 2026—Filed May 15, 2026

**Javonte Hines-Miller,**

Appellee,

vs.

**Ashlea Teter,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Boone County, Christopher C. Polking, judge.

A mother seeks further review of the court of appeals decision affirming the denial of her petition to modify the physical care provisions of a custody decree. **Decision of Court of Appeals Vacated; District Court Judgment Reversed and Case Remanded.**

Christensen, C.J., delivered the opinion of the court, in which all justices joined.

Thomas L. Hillers (argued) of Hillers Legal, P.C., State Center, for appellant.

Jason Springer (argued) of Springer Law Firm, PLLC, Madrid, for appellee.

**Christensen, Chief Justice.**

"[I]f the legis[la]ture does not trust a domestic abuser to choose their child's dentist, it certainly does not trust that same abuser to care for the child on a daily basis," observed the dissenting court of appeals judge in this case. And while that may be the case, the legislature's statutory definitions and word choice in Iowa Code chapter 598 say otherwise. Therefore, the rebuttable presumption against awarding joint *legal custody* when a history of domestic abuse exists under Iowa Code section 598.41(1)(*b*) (2023) does not apply equally against awarding primary *physical care* to a parent with a history of perpetrating domestic abuse.

Nonetheless, this does not mean that a parent's history of domestic abuse is irrelevant in physical care determinations. In fact, it remains a significant consideration, especially when the parent is a serial abuser. Because the district court found that a substantial change in circumstances existed and that Ashlea had provided evidence of stability and a home free of domestic violence, she established herself as the superior parent. The district court should have granted her petition to modify. Accordingly, we vacate the court of appeals decision, reverse the district court ruling, modify the decree to award the mother physical care of the child, and remand for the district court to establish a visitation schedule and calculate child support.

### I. Background Facts and Proceedings.

Ashlea Teter and Javonte Hines-Miller are parents to K.M., who was born in 2016. They never married and eventually separated. They first sought a court decision concerning legal custody and physical care of K.M. in 2019 when Javonte petitioned for sole legal custody with "reasonable and liberal visitation rights" for Ashlea. The district court issued a ruling on temporary matters in August 2019 that ordered the parties to have joint legal custody of K.M. during

the pendency of the matter, with Ashlea having primary physical care. In that ruling, the district court wrote, "[Javonte] acknowledges having hit [Ashlea], and has some criminal history related to domestic abuse assault/assault. [Javonte] was evasive in his testimony regarding abuse." It also observed that "[e]ach party has used the child as a pawn in an attempt to get the other to comply with their wishes."

The case proceeded to trial in December, and the district court entered a decree in January 2020 that granted joint legal custody but named Javonte as K.M.'s primary caretaker. Although it found each parent was a suitable caretaker, it maintained that Javonte was more attentive to K.M.'s needs and did a better job supporting K.M.'s relationship with Ashlea, even though both parents demonstrated hostility toward each other.

The district court reached this decision despite Javonte's history of domestic abuse, which was an issue at trial and remains an issue in this case. At the 2019 trial, Javonte acknowledged the following three instances of assault:

- **2012:** Javonte was convicted of disorderly conduct and took an eight-hour assault behavior class while he was still in high school because he hit a fan, which then hit a girl he was dating.

- **2015:** Javonte was charged with felony domestic assault including strangulation with Ashlea as the victim. His testimony was "that Ashlea got physical and slapped him"; he then clarified, "[W]ell both of us kind of [did]." The charges were dismissed after Ashlea signed and filed an affidavit stating that nothing had happened, that she was unharmed and not afraid of Javonte, and that the charge was not fair. At the 2019 trial over legal custody, she testified that Javonte pressured her to say

that nothing happened, and he had pushed her to the floor and over a couch, strangled her, and thrown her to the ground by her hair.

- **2016:** Javonte pleaded guilty to domestic abuse assault and completed twenty-six weeks of batterer's education for an attack on Ashlea. He claimed that he tried to leave with K.M., but Ashlea blocked him and spat in his face, so he responded by headbutting Ashlea. Javonte was later granted a deferred judgment and had his conviction expunged.

In examining these incidents, the district court "found the testimony of each party to be not very credible," given their "great hostility to each other." Regarding Ashlea's 2015 affidavit denying Javonte's abuse, the district court noted, "This sets up the classic conundrum of was she lying then or is she lying now? . . . It was the uncontroverted testimony of Javonte that Ashlea had a friend with her during the incident. Ashlea called no witnesses to corroborate her version of events." It also remarked that "Javonte called several witnesses who corroborated large and important parts of his testimony," which left the district court "with the impression that if Ashlea had evidence and testimony favorable to herself, she could and would have presented it."

While Javonte's "abusive incidents" gave the district court "pause," it determined Javonte had rebutted the presumption against awarding joint legal custody when a history of domestic abuse exists under Iowa Code section 598.41(1)(*b*). It explained that the 2012 incident occurred when Javonte was still in high school, did not involve Ashlea, and was characterized as disorderly conduct rather than domestic assault. The district court again documented that Ashlea recanted her 2015 allegations against Javonte and

"either lied in that sworn statement or lied under oath to the court at trial."[1] Finally, it gave Javonte credit for successfully completing a deferred judgment in the 2016 case and documented the absence of any incidents of assault since.

**A. 2021 Modification Action.** About a year and a half after the district court issued this decree, Ashlea petitioned to modify the physical care provisions partly due to a new May 2020 domestic abuse charge against Javonte involving a girlfriend with whom he had been living. On November 30, 2020, Javonte pleaded guilty to charges of stalking in violation of a no-contact order and domestic abuse assault causing bodily injury. He received a suspended sentence but initially spent some time in jail. The district court presiding over Ashlea's modification petition found "no evidence that this situation affected [K.M.] in any way."

It continued to document the parents' hostility toward each other and explained that it did "not believe that these convictions constitute a substantial change in circumstances" because they "appear to be an isolated incident that is not likely to reoccur, particularly considering that it happened in May of 2020—more than a year and a half before the modification trial." The district court also found "it significant that the victim of this offense is no longer part of Javonte's life and that  [K.M.] was not present during this incident and was apparently unaffected by it." Plus, Javonte's girlfriend at the time of the modification trial, Kaylee, "testified that Javonte has never been violent with her and that there is not violence in the home."

Moreover, the district court rejected Ashlea's claims that Javonte failed to support her relationship with K.M. Although it found neither parent "particularly

---

[1]We have previously acknowledged that the complex dynamics of domestic abuse can lead victims to recant, ask to drop the criminal case, refuse to testify, or downplay their risks. *See State v. Smith*, 876 N.W.2d 180, 187–88 (Iowa 2016).

credible," it found Javonte's witnesses contradicting Ashlea's claims credible. It also based this credibility finding on Javonte's testimony that "Ashlea has contacted [H]HS multiple times to make reports about him but these reports have all been unfounded"[2] and an audio recording in which Ashlea tells Javonte to get off her and claims he is trying to sexually assault her—while also laughing. In sum, the district court concluded Ashlea failed to meet her burden and denied the modification petition.

**B. Current Modification Action.** In February 2023, Ashlea petitioned again to modify the physical care portion of the custody decree. She did so based on Javonte's guilty plea to yet another charge of domestic assault stemming from his January 2023 altercation with his fiancée, Kaylee, whom he later married in July 2024. According to police reports,

> [Javonte] had attempted to pull an engagement ring off of [Kaylee's] finger causing swelling and redness to the left ring finger of [Kaylee]. [Javonte] also pulled [Kaylee] down by the hair and got on top of her and put both hands around [Kaylee's] neck which caused [Kaylee] to feel as if she was going to pass out. [Kaylee] stated that she could not get up immediately after feeling as though her eyes were rolling into [the] back of her head. [Kaylee] has visible marks on both sides of her neck.

The report also noted that the altercation "happened in bed where two children were present" and "[t]he children were woken up due to the altercation." K.M. was not in the home at the time, and the two children involved were Javonte and Kaylee's young daughters. There is a thirty-minute bodycam video in the record of the police responding to Kaylee about the altercation, along with photographs of Kaylee's injuries. Javonte pleaded guilty to domestic assault

---

[2]It is unclear from our record on appeal whether there was any other evidence of these unfounded reports during the 2021 modification action.

causing bodily injury, received probation, and was ordered to complete a batterer's education class.

The modification trial occurred on October 2, 2024. At the time, Ashlea had an eleven-year-old daughter who lived with her full-time and a nine-year-old son who was in her care every other weekend. They had lived in a home in Boone for approximately four years with her fiancé, Brandon, and his six-year-old daughter. Ashlea worked night shifts as a tech for the Boone County Hospital, and her fiancé was a member of the National Guard and watched the kids while she worked.

Javonte and Kaylee lived in Ames with K.M. and their two daughters, who were two and three years old. He had worked for Builders FirstSource in Des Moines for approximately seven years, and his wife was a merchandise store manager in Ames. Javonte has another child who lived out of state as of the 2021 modification action. According to the record, Javonte is not on the child's birth certificate but provides the child's mother with financial support.

The district court heard testimony from Ashlea, Javonte, Kaylee, and Kaylee's parents. Ashlea testified to her concern that K.M. was struggling with anger but that she could not enroll him in anger management over Javonte's objection. She discussed how K.M. has been in three different school districts and lived in multiple places with Javonte over the past five years, stating, "He went from Madrid to an apartment in Ankeny, back to Madrid. He's lived in Huxley and then Story City, back to Madrid, and now Ames."

Ashlea testified that she planned to maintain K.M. in his current activities if she received primary care and enroll him in anger management. She also claimed that her home would be a better environment for K.M. because "[t]here's always either Brandon or I at home. The siblings are there. We have never had any physical altercations or anything like that in our house." Additionally, Ashlea

claimed that K.M. was supposed to be at Javonte's house on the night of the January 2023 domestic assault, but he spent the night at Javonte's friend Lindsey's house.

Javonte acknowledged that K.M. had moved around schools, claiming that he moved K.M. from Roland-Story due to bullying and then to Ames because he and Kaylee "wanted a fresh start." Regarding the 2023 domestic assault causing bodily injury to which Javonte pleaded guilty, he admitted trying to take the ring off Kaylee's finger but downplayed it, explaining, "So she like started pushing me back or whatever so I -- when I tried to take the ring off her finger, her finger got swollen, I guess, from me trying to pull it off. And then I ended up just leaving, getting my keys from her and just leaving. And then I had a warrant."

He claimed that this arrest warrant was the result of Kaylee's dad being friends with a police officer, whom Kaylee had texted about the assault. Javonte denied the strangulation, getting on top of Kaylee, pulling her hair, and that the daughters were in the room. He testified that he and Kaylee are in a good place, proclaiming, "We literally don't argue with each other. We bicker, but we get over it. There's no screaming matches."

Javonte challenged Ashlea's claim that K.M. struggled with anger, maintaining that K.M. was never aggressive at his house. When asked about a school report that K.M. needs to work on keeping his body to himself, Javonte reasoned, "[B]oys are boys. They hang on each other. It's not him hitting anybody or pushing anybody." Nevertheless, he did mention a time when K.M. got mad at football and threw his helmet on the ground, then walked the whole time after the coach ordered him to run to the pole and back for punishment. Javonte explained that this is why he makes K.M. run laps as discipline.

Kaylee testified that Javonte did not choke her and denied having any marks on her neck despite the photographs in the record to the contrary. She

acknowledged the police bodycam footage but declared, "I lied about him choking me 'cause I was upset and he didn't come home and it was in a moment." According to Kaylee's description of the incident, they "had a disagreement and he tried to leave, and I stood in front of the door so he couldn't leave." She also said that he "tried to get my ring off my finger, and he pushed me." These explanations contradict what Kaylee previously said in the thirty-minute bodycam footage when she initially reported the incident to police.

Similarly, Kaylee's mother testified that she "just knew that there must have been a disagreement or something and it kind of sounded like maybe -- I don't know the details, but maybe that Kaylee got pushed." The district court reported that "Kaylee's mom was extremely evasive and not at all credible," and neither of Kaylee's parents was aware that the 2023 conviction was Javonte's fourth for domestic abuse.

The district court subsequently denied Ashlea's modification request for primary physical care. It concluded that Javonte's history of domestic abuse created a substantial change in circumstances "because the court has twice anticipated that Javonte's domestic abuse incidents were isolated, and after successful completion of the domestic abuse class he would not repeat such behavior." However, it found no evidence that Javonte's convictions had "a direct negative effect on [K.M.]," noting that "[w]hile Ashlea indicates she has seen aggressive behavior in [K.M.] at her house, this is not indicated by the most recent report card to be a problem at school," and that "[t]here is also not evidence to show it is a problem at Javonte's house."

The district court remarked that Javonte's history of domestic violence "made this a terribly close case where it otherwise would not have been." It framed the issue as whether "Ashlea's lack of a history of domestic abuse [was] enough to make her a superior parent at this time to Javonte" and concluded

that her lack of history was not enough. Moreover, the district court criticized Ashlea for being "focused on the flaws of Javonte" instead of focusing on proving that she is the superior parent. While it acknowledged Ashlea's years of stable housing, employment, and relationship with her fiancé, the district court stated that it did not know much else about her or her fiancé and was concerned that Ashlea did not have primary care of her other son for reasons unknown to the district court.[3]

Finally, the district court wrote that Ashlea would likely "continue doing what Javonte has as far as schooling and extracurriculars like football" and found no evidence that one parent was more supportive or a better communicator than the other. In declining to modify the decree, it stated that it lacked "a clear idea of what parenting strengths Ashlea would otherwise bring that are not matched by what Javonte is doing."

Ashlea filed a timely appeal, which we transferred to the court of appeals. In a split decision, the court of appeals affirmed the district court's ruling. A dissenting judge would have reversed the district court, explaining, "Javonte's domestic violence presents a great enough threat to his child's safety and development that the basic display of stability presented by the child's mother, Ashlea Teter, demonstrates her superior ability to minister to the needs of the child." We granted Ashlea's further review application and review the case de novo. *In re Marriage of Kisting*, 6 N.W.3d 326, 332 (Iowa Ct. App. 2024). "While we are not bound by the fact-findings of the district court, we give them weight, especially as to credibility determinations." *Id.* (quoting *Thorpe v. Hostetler*, 949 N.W.2d 1, 4 (Iowa Ct. App. 2020)).

---

[3]The district court's negative conclusion about Ashlea because she did not have primary care of her other son despite no evidence is perplexing considering it had no concern over Javonte's additional child living in another state—also for reasons unknown in the record.

**II. Analysis.**

Ashlea maintains that the district court should have modified the decree to award her primary physical care. As the party seeking modification, Ashlea had to "prove by a preponderance of the evidence that the circumstances have so materially and substantially changed since the decree was entered that the requested modification is in [K.M.'s] best interests." *In re Marriage of Frazier*, 1 N.W.3d 775, 781 (Iowa 2024). She also had to prove that she could minister to K.M.'s well-being more effectively than Javonte, as physical care decisions "should be disturbed only for the most cogent reasons." *Kisting*, 6 N.W.3d at 332 (quoting *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015)). Our primary focus is "what is best for the *child.*" *Id.* (quoting *Hoffman*, 867 N.W.2d at 34).

Here, the district court determined that Ashlea met her burden on the first part by establishing a substantial change in circumstances since the decree "because the court has twice anticipated that Javonte's domestic abuse incidents were isolated, and after successful completion of the domestic abuse class he would not repeat such behavior." Javonte concedes as much on appeal. Thus, the issue on appeal is whether the district court erred in concluding that Ashlea failed to demonstrate her ability to provide superior parenting to K.M.

**A. The Rebuttable Presumption Against Joint Legal Custody in Iowa Code Section 598.41.** At the outset, we must clarify whether there is a rebuttable presumption against awarding physical care to a parent with a history of domestic abuse. In *In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007), we explained that "Iowa Code section 598.41(3) does not directly apply to *physical care* decisions," as opposed to *legal custody* decisions. Iowa Code section 598.41 lists factors that the district court must consider in determining "what custody arrangement . . . is in the best interest of the minor child." Iowa

Code § 598.41(3).[4] Relevant here is Iowa Code section 598.41(3)(*j*), which requires the district court to consider "[w]hether a history of domestic abuse, as defined in section 236.2, exists." Additionally, under Iowa Code section 598.41(1)(*b*), "if the court finds that a history of domestic abuse exists, a rebuttable presumption against the awarding of joint custody exists." If this history "is not rebutted, [it] shall outweigh consideration of any other factor specified in subsection 3 in the determination of the awarding of custody under this subsection." *Id.* § 598.41(2)(*c*).

Despite stating in *Hansen* that "Iowa Code section 598.41(3) does not directly apply to *physical care* decisions," 733 N.W.2d at 696, we also held in that same case, "Evidence of untreated domestic battering should be given considerable weight in determining custody and gives rise to a presumption against joint physical care," *id.* at 698. In doing so, we cited Iowa Code section 598.41(2)(*c*). *Id.* This has created confusion in the lower courts over whether there is a rebuttable presumption involving a history of domestic abuse that applies to disputes over *physical care*, not just *legal custody*. *See, e.g.*, *In re Marriage of Wieland*, No. 22–0541, 2022 WL 17826932, at *4 (Iowa Ct. App. Dec. 21, 2022) ("[T]he question of whether the rebuttable presumption against 'joint custody' contained in section 598.41(1)(*b*) applies only to legal-custody—not physical-care—decisions seems to be unanswered . . . .").[5]

---

[4]Iowa Code chapter 600B governs this case because Ashlea and Javonte never married, but we apply Iowa Code section 598.41 to determine their legal custody and physical care arrangements. *See* Iowa Code § 600B.40(2).

[5]In *In re Marriage of Wieland*, the court of appeals summarized the conflicting caselaw in the following corresponding footnote:

> In approaching these murky waters, we have found language in cases supporting each side of this argument. *Compare In re Marriage of Ford*, 563 N.W.2d 629, 632 (Iowa 1997) (affirming that section 598.41(1)(*b*) "merely creates a *rebuttable* presumption against joint custody"), *In re Marriage of Knecht*, No. 10-0240, 2010 WL 3894449, at *3 (Iowa Ct. App. Oct. 6, 2010) (finding the rebuttable presumption involving a history of domestic abuse did not apply in a dispute over

Whether Iowa Code section 598.41(1)(*b*) also provides a rebuttable presumption against joint physical care is a matter of statutory interpretation. We will not resort to our rules of construction when the statutory text and meaning are clear. *Est. of Butterfield v. Chautauqua Guest Home, Inc.*, 987 N.W.2d 834, 838 (Iowa 2023). Moreover, "When the legislature has defined words in a statute—that is, when the legislature has opted to 'act as its own lexicographer'—those definitions bind us." *In re J.C.*, 857 N.W.2d 495, 500 (Iowa 2014) (quoting *State v. Fischer*, 785 N.W.2d 697, 702 (Iowa 2010)). "[U]nambiguous statutory language is the strongest evidence of the legislature's intent," *id.*, and the legislature's explicit definitions for certain terms in Iowa Code section 598.41 prevent us from applying the rebuttable presumption against joint legal custody to physical care determinations when there is a history of domestic abuse.

The legislature provided statutory definitions that distinguish "custody" from "physical care." Under chapter 598, "joint custody" and "custody" both refer to "legal custody of a minor child," which includes but is "not limited to decision

---

the award of physical care, but noting the parents agreed to share legal custody), *and In re Marriage of Mulford*, No. 03-1259, 2004 WL 894566, at *2 (Iowa Ct. App. Apr. 28, 2004) (noting the a history of domestic abuse might give rise to a rebuttable presumption of sole custody but that, in the decision over physical care, it is a significant factor to consider as opposed to a presumption), *with Stieneke v. Sargent*, No. 15-1643, 2016 WL 2745058, at *3–4 (Iowa Ct. App. May 11, 2016) (finding evidence of domestic abuse creates a rebuttable presumption against an award of joint custody). And there is the inconsistent language found in *In re Marriage of Hansen*, where the court determined that "Iowa Code section 598.41(3) does not directly apply to *physical care* decisions" but also said after citing this same section, that "[e]vidence of untreated domestic battering should be given considerable weight in determining custody and gives rise to a presumption against joint physical care." 733 N.W.2d 683, 696, 698 (Iowa 2007).

*Wieland*, 2022 WL 17826932, at *4 n.6. This confusion is on display again in the conflicting majority and dissenting opinions from the court of appeals in this case. The majority concluded that "the rebuttable presumption discussed in section 598.41(1)(*b*) pertains to the award of legal custody, not physical care," while the dissent declared that the presumption's applicability to physical care "is a question left for another day."

making affecting the child's legal status, medical care, education, extracurricular activities, and religious instruction." Iowa Code § 598.1(5); *accord id.* § 598.1(3). In contrast, " '*Physical care*' means the right and responsibility to maintain a home for the minor child and provide for the routine care of the child." *Id.* § 598.1(7). Despite separately defining "custody" and "physical care," the legislature chose to only create "a rebuttable presumption against the awarding of joint custody" when a history of domestic abuse exists. *Id.* § 598.41(1)(*b*); *see also id.* § 598.41(2)(*c*) ("A finding by the court that a history of domestic abuse exists, . . . which is not rebutted, shall outweigh consideration of any other factor specified in subsection 3 in the determination of the awarding of custody under this subsection."). This is even though other portions of Iowa Code section 598.41 establish when a district court may award "joint physical care" and what that entails. *Id.* § 598.41(5)(*a*)–(*b*).

We question whether the legislature realized that this presumption applies only to legal custody decisions and does not include physical care. Yet, "We cannot allow legislative intent to change the meaning of a statute if the words used by the legislature will not allow for such a meaning." *State v. Mathias*, 936 N.W.2d 222, 227 (Iowa 2019); *see also State v. Rhodes*, 6 N.W.3d 741, 752 (Iowa 2024) ("We cannot give effect to Iowa Code section 724.25(2) by reading out the language the legislature chose—'as used in this chapter'—while reading in language—'antique firearm'—that does not appear in section 724.26.").

The legislature chose to ascribe different meanings to "custody" and "physical care," and it only created a statutory rebuttable presumption for *legal custody* determinations, not *physical care* determinations. "[W]e ascertain legislative intent from the words the legislature used, rather than from what one could argue it meant to say." *Zimmer v. Vander Waal*, 780 N.W.2d 730, 735 (Iowa 2010); *see also Doe v. Iowa Dep't of Hum. Servs.*, 786 N.W.2d 853, 858 (Iowa

2010) ("We may not extend, enlarge, or otherwise change the meaning of a statute under the guise of construction."). Thus, the rebuttable presumption against joint legal custody under Iowa Code section 598.41(1)(*b*), if the court finds that a history of domestic abuse exists, does not apply to physical care determinations.

Notably, other states have specifically included physical care in their statutes implementing a rebuttable presumption against awarding legal custody or physical care to a parent with a history of perpetrating domestic abuse.[6] Our legislature can do the same if it sees fit. Nevertheless, as we explain below, the absence of this rebuttable presumption in physical care determinations does not render a history of domestic abuse irrelevant. To the extent that the district court erred in applying this presumption, remand is unnecessary because it also concluded that Javonte rebutted the presumption and declined to modify the decree.

**B. Whether Javonte's History of Domestic Abuse Warranted Modification of the Physical Care Arrangement.** Even though the rebuttable presumption in Iowa Code section 598.41(1)(*b*) does not apply to physical care determinations, our appellate courts have consistently held that the factors listed in that statute—including whether there is a history of domestic abuse—are

---

[6]*See, e.g.*, Ala. Code § 30–3–133 (2026) ("In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that domestic or family violence has occurred raises a rebuttable presumption by the court that it is in the best interest of the child to reside with the parent who is not a perpetrator of domestic or family violence in the location of that parent's choice, within or outside the state."); Alaska Stat. § 25.24.150(g) (2025) ("There is a rebuttable presumption that a parent who has a history of perpetrating domestic violence against the other parent, a child, or a domestic living partner may not be awarded sole legal custody, sole physical custody, joint legal custody, or joint physical custody of a child."); Del. Code Ann. tit. 13, § 705A(b) (2026) ("Notwithstanding other provisions of this title, there shall be a rebuttable presumption that no child shall primarily reside with a perpetrator of domestic violence."); Minn. Stat. § 518.17(1)(*b*)(9) (2026) ("[T]he court shall use a rebuttable presumption that joint legal custody or joint physical custody is not in the best interests of the child if domestic abuse, as defined in section 518B.01, has occurred between the parents.").

relevant in determining which physical care arrangement is best for the child. *See, e.g., In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020) ("[I]n this case, domestic abuse was a factor to be considered in connection with the question of joint physical care of the couple's children."); *Hansen*, 733 N.W.2d at 696; *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007) ("[T]he existence of domestic abuse is a significant factor in determining whether joint physical care is appropriate."); *In re Marriage of Daniels*, 568 N.W.2d 51, 55 (Iowa Ct. App. 1997) ("[W]e believe evidence of untreated domestic battering should be given considerable weight in determining the primary caretaker, and under some circumstances even foreclose an award of primary care to a spouse who batters."). Additionally, we give "[e]vidence of untreated domestic battering . . . considerable weight." *Hansen*, 733 N.W.2d at 698; *see also Daniels*, 568 N.W.2d at 55. Ashlea maintains that the district court erred in concluding that she did not demonstrate a superior ability to minister to K.M.'s needs. On our de novo review, we agree. *See Kisting*, 6 N.W.3d at 332; *see also Hora v. Hora*, 5 N.W.3d 635, 645 (Iowa 2024) ("De novo review means we review the entire record and 'decide anew the issues properly preserved for appellate review.'" (quoting *Struve v. Struve*, 930 N.W.2d 368, 371 (Iowa 2019))).

"The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *Thorpe*, 949 N.W.2d at 7 (quoting *Hansen*, 733 N.W.2d at 695). The district court concluded that Javonte was most likely to provide this because K.M. was "doing well" in his placement, and "Ashlea's lack of a history of domestic abuse [was not] enough to make her a superior parent at this time to Javonte." It also explained that there was "not evidence of a direct negative effect" of Javonte's domestic abuse on K.M.

Frankly, the district court's focus on the absence of a "direct negative effect" of the domestic abuse on the child and its subsequent conclusion contradict what our appellate courts have said for more than thirty years on the matter. In *In re Marriage of Brainard*, 523 N.W.2d 611, 615 (Iowa Ct. App. 1994), the court of appeals discussed how "[c]hildren raised in homes touched by domestic abuse are often left with deep scars, revealed in the form of increased anxiety, insecurity and a greater likelihood for later problems in interpersonal relationships." It cited studies estimating that "child abuse is present in one-half of homes where spousal abuse is present" and reporting that "[i]t is believed that about 70% of batterers grew up in violent homes." *Id.* at 615 n.2. The court of appeals reiterated this a few years later, declaring, "Domestic abuse is, in every respect, dramatically opposed to a child's best interests." *Daniels*, 568 N.W.2d at 55. These findings still ring true. *See In re C.C.W.*, 440 P.3d 749, 754–55 (Utah Ct. App. 2019) (discussing and citing various sources indicating "that a parent's acts of domestic violence can have adverse impacts on a child, even if that child is not the direct object of such violence, and even if the child does not directly witness the violence").

In a related context, we held that a father's physical abuse of other family members and history of domestic violence—without physical abuse of the child at issue—supported the child's CINA adjudication because the child was imminently likely to suffer harmful effects from the father's behavior. *In re L.H.*, 904 N.W.2d 145, 152–53 (Iowa 2017). In doing so, we cited studies showing that children from violent homes are susceptible to impaired social competence and posttraumatic stress disorder. *Id.* at 153. We also stressed that the child's parents "continue[d] to minimize and/or deny the presence of domestic violence in their relationship," akin to the minimization that Javonte and Kaylee presented in their testimony here. *Id.*

We explained that this failure of the parents in *L.H.* to address their role in the abuse was an important aspect of the parents' care for the child that could hurt their chances of regaining care. *Id.*; *see also In re C.H.*, 652 N.W.2d 144, 150–51 (Iowa 2002) (noting that a "parent's failure to address his or her role in the abuse may hurt the parents' chances of regaining custody and care of their children" and upholding termination of parental rights for a parent due to the parent's continuous refusal "to comply with the case permanency plan"). Likewise, our appellate courts frequently have upheld decisions not to return children to their parents due to unresolved domestic abuse issues. *See, e.g.*, *In re B.C.*, No. 25–1179, 2025 WL 2924724, at *2–3 (Iowa Ct. App. Oct. 15, 2025); *In re R.E.*, No. 25–0088, 2025 WL 1704916, at *4 (Iowa Ct. App. June 18, 2025); *In re T.W.*, No. 20–0145, 2020 WL 1881115, at *4 (Iowa Ct. App. Apr. 15, 2020).

In sum, a parent's history of serial domestic abuse is a significant consideration in physical care determinations regardless of whether the parent directly perpetrated that abuse of the child or in the child's presence. This does not mean that any evidence of domestic abuse automatically precludes the offending parent from primary care of the child. Rather, in deciding how much weight to give a parent's history of domestic abuse, courts should consider the following factors: (1) how much time has passed since the last act of abuse; (2) whether the parent has acknowledged their role in the abuse; and (3) what steps the parent has taken beyond mere compliance with a court-ordered treatment to prevent future abuse, including addressing any substance abuse that has contributed to the parent's abusive actions. *See In re Marriage of Ford*, 563 N.W.2d 629, 632–33 (Iowa 1997).

For example, in *In re Marriage of Ford*, we affirmed the district court's decision to award the parents joint legal custody of the children with the father

as their primary caretaker despite his history of domestic abuse. *Id.* at 633–34. We explained,

> It is undisputed that the last incident of domestic abuse occurred over four years ago. Kelvin has acknowledged this abuse and states that he has taken steps to deal with it. He provided credible testimony that he sought the support of his family and church in correcting his problem. Additionally, the record indicates that Kelvin has overcome his drug and alcohol dependency, dependencies that he admits contributed to his violence. The fact that Kelvin never attended a formal treatment program does not necessarily mean that he has not overcome his problem. He has subsequently received his college degree, has full-time employment, and has become an active member of his church. Testimony was adduced by church friends and family that Kelvin has matured and has improved in these areas of his life. His testimony certainly convinced the district court and suggests to us that the domestic abuse is no longer a problem.

*Id.* at 632–33.

Applying those same factors in *Ford* here, we find that Javonte's testimony and the other evidence in this case have not convinced us that his domestic abuse is no longer a problem. First, the modification trial occurred a little over a year and a half after Javonte's last criminal charges were filed. While there is no evidence of additional abuse in that time, this offers little consolation, considering Javonte's history of domestic incidents dates back to 2012.

The record shows that Javonte has escalated from his first conviction—which the district court characterized as not involving a "direct physical assault"—to "g[etting] physical" in 2015; headbutting in 2016; stalking and domestic assault causing bodily injury in 2020; and, most recently, pulling his now-wife by the hair, climbing on top of her, and strangling her in bed next to their two young children. It was a mere coincidence that K.M. was not home at the time of the most recent episode.

Second, Javonte has yet to fully acknowledge his role in the abuse. Despite his guilty plea and the police reports, photographs, and bodycam footage to the contrary, Javonte continued to minimize and deny any domestic violence issues with his wife during the modification trial. He also testified that he and Kaylee were currently in a good place, stating, "We literally don't argue with each other. We bicker, but we get over it. There's no screaming matches." This evidence does not suggest that Javonte has meaningfully addressed his domestic violence issues, especially given that the district court found Javonte and Kaylee's "denials [were] not credible[] and unconvincing."

Finally, the only steps Javonte has taken to prevent future abuse were court-ordered. He offered no testimony on any other steps he has taken to meaningfully address his history of abuse and did not provide credible testimony from anyone else in his life to show that he "has matured and has improved in these areas of his life." *Id.* at 633. It also does not help his case that he has reoffended multiple times since he first completed the court-mandated batterer's education class.

Consequently, we fail to see how the district court concluded that this "history of domestic abuse," as the district court remarked, was not "enough to make [Ashlea] a superior parent at this time to Javonte," let alone how Javonte rebutted the presumption against him that the district court erroneously applied. By all appearances, the district court placed Ashlea and Javonte on equal footing in reaching its decision, noting Ashlea's lack of domestic abuse history was "the only factor in regard to which the court finds evidence that she would do better than Javonte."

However, a household free from domestic abuse was not the only way Ashlea would parent differently. She also sought to address her concerns about K.M.'s aggressive behavior. The district court's finding that there was no

"evidence of a direct negative effect" on K.M. from Javonte's abuse dismissed Ashlea's testimony that K.M. was showing aggressive behavior. It reasoned that K.M.'s report card did not list it as a problem, and there was "not evidence to show it is a problem at Javonte's house." Considering the district court found Javonte, Kaylee, and Kaylee's mother not credible in their testimony about Javonte's abuse, its reliance on their testimony to conclude that K.M.'s aggression was not an issue is troubling.

Significantly, there is a 2021 email to Ashlea in the record from the Roland-Story counselor who met with K.M. The counselor wrote, "[A]s of right now nothing is coming up that I can say might be causing the aggression. I can only say, I think going back and forth is hard for many kids in this situation and it comes out in different ways. This could be his." Javonte also testified about a situation in which K.M. got upset at football, threw his helmet, and then ignored the coach's order to run as discipline by choosing to walk instead. Moreover, the district court acknowledged that even though Ashlea signed K.M. up for counseling when he was attending school in Madrid, Javonte canceled it.

Even assuming that aggression was not an issue for K.M. and Ashlea "would continue doing what Javonte has as far as schooling and extracurriculars like football," the district court's focus on the "general paucity in the record of the positives that Ashlea is prepared to bring" ignores longstanding precedent that "stability is the trump card" in modification cases. *Thorpe*, 949 N.W.2d at 7 (quoting *Rolling v. Hoffman*, No. 14–0102, 2014 WL 2600315, at *2 (Iowa Ct. App. June 11, 2014)). The court of appeals illustrated this in *Thorpe*, in which it emphasized the mother's instability based on her "history of short-term relationships with men and multiple changes in residence as a factor supporting her instability." *Id.* at 8. The record shows a similar sense of instability for Javonte, and "we look to [that] past performance because it may indicate the

quality of care the parent is capable of providing in the future." *In re C.K.*, 558 N.W.2d 170, 172 (Iowa 1997).

The testimony at the modification hearing showed that Javonte, and thus K.M., had lived in multiple places over the past five years. This included moving from Madrid to Ankeny before moving back to Madrid, stopping in Huxley and Story City, then back to Madrid again before moving to Javonte's current residence with Kaylee in Ames. He explained that he and Kaylee moved to Ames because they "wanted a fresh start." The record also shows that K.M. has been in three different school districts: Madrid, Roland-Story, and Ames.

In contrast, the district court observed that Ashlea maintained stable employment as a medical tech and had lived in the same home with her fiancé and their three other children since 2020. She testified that she planned to maintain K.M.'s schooling and extracurriculars, and nothing in the record suggests that she is an inappropriate caregiver. So to answer the district court's question of whether "Ashlea's lack of a history of domestic abuse [is] enough to make her a superior parent," under these circumstances, the answer is overwhelmingly "yes."

**III. Conclusion.**

For these reasons, we vacate the court of appeals decision, reverse the district court ruling, modify the decree to award Ashlea physical care of the child, and remand for the district court to establish a visitation schedule and calculate child support.

**Decision of Court of Appeals Vacated; District Court Judgment Reversed and Case Remanded.**